**SCHOOL DISTRICT OF WISCONSIN DELLS, Plaintiff,**

**v.**

**Z.S. and Judith Littlegeorge, Defendants.**

**Judy Littlegeorge, Plaintiff,**

**v.**

**Wisconsin Dells School District, Defendant.**

Nos. 00–C–619–C, 00–C–0662–C.

United States District Court,
W.D. Wisconsin.

Sept. 10, 2001.

Linda Hale, Baraboo, WI, for Judy Littlegeorge.

David E. Rohrer, Lathrop & Clark, Madison, WI, for School Dist. of Wisconsin Dells.

OPINION AND ORDER

CRABB, Chief Judge.

These are two consolidated civil actions arising out of an administrative hearing. In case no. 00–C–0619–C, plaintiff School District of Wisconsin Dells seeks reversal of the decision of an administrative law judge under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1487. *See* 20 U.S.C. § 1415(i)(2)(A). Plaintiff contends that the administrative law judge erred in reaching two conclusions: that defendant Z.S. was a child with both an emotional disability and autism and that plaintiff did not provide Z.S. with a free and appropriate public education during the 1999–2000 school year. Defendants Z.S. and Judith Littlegeorge have filed four counterclaims in which they seek injunctive and monetary relief, alleging that plaintiff violated the Individuals with

Disabilities Education Act; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. § 1983. Defendants also bring a state law claim of negligent hiring.

Case no. 00–C–0662–C is a suit brought by Judy Littlegeorge seeking attorney fees and costs as the prevailing party in the administrative action. It was filed originally in state court and removed to this court by the school district. Because this case is a duplication of the counterclaim filed by Littlegeorge in 00–C–0619–C, I need not discuss it further. In the remainder of this opinion, I will address only case no. 00–C–0619–C, which is before the court on the plaintiff school district's motion for summary judgment on its IDEA claim and on defendants' four counterclaims.

As explained in this court's *Procedures to be Followed on Motions for Summary Judgment*, a copy of which was given to each party with the Preliminary Pretrial Conference Order on December 14, 2000, I will take as undisputed plaintiff's proposed facts that defendants do not contest specifically with proposed facts of their own that are based on record evidence. *See Procedures*, II.C.1 ("Unless the nonmovant properly places a factual proposition of the movant into dispute, the court will conclude that there is no genuine issue as to the finding of fact initially proposed by the movant.") The Court of Appeals for the Seventh Circuit has stated that "entry of summary judgment will be sustained 'where the nonmovant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts,' if on the basis of the factual record the movant is entitled to judgment as a matter of law." *Johnny Blastoff v. Los Angeles Rams Football Co.*, 188 F.3d 427, 439 (7th Cir.1999) (quoting *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir.1997)).

Facts contained in defendants' brief will not be considered because none was properly made the subject of a proposed finding of fact supported by record evidence.

Plaintiff's motion for summary judgment will be granted on its IDEA claim. My own independent determination is that the Individualized Education Programs that plaintiff developed for defendant Z.S. for the 1999–2000 school year met the requirements of the IDEA. Although the administrative law judge found to the contrary, I believe that he erred in his determination. Summary judgment will be granted to plaintiff on defendants' counterclaims because no reasonable finder of fact could conclude that plaintiff violated § 504 of the Rehabilitation Act, § 1983 or the state law prohibiting negligent hiring.

For the purpose of deciding the pending motion for summary judgment, I find from the facts proposed by plaintiff and from the administrative record that the following facts are material and undisputed.

## UNDISPUTED FACTS

Plaintiff School District of Wisconsin Dells is a political body organized and operating pursuant to Wisconsin statutes. Defendant Z.S. is a student who lives within the boundaries of plaintiff school district. He was born on August 28, 1988. Defendant Judith Littlegeorge is Z.S.'s grandmother and legal guardian.

### A. 1991 Initial Evaluation and 1991—1993 Individualized Education Programs

On September 5, 1991, when defendant Z.S. was just three, defendant Littlegeorge referred him to plaintiff for an initial multidisciplinary evaluation because of her concerns about his speech delays and behavior problems. On September 20, 1991, plaintiff assigned Z.S. a multidisciplinary evaluation team, consisting of G. Webb

(school psychologist), M. Jansen (an early childhood special education teacher), K. Kolumba (a speech clinician, who was also an early childhood special education teacher) and E. Voigt (school principal). On October 28, 1991, the multidisciplinary team conducted a meeting and generated a summary report, determining that defendant Z.S. was a child with an emotional disturbance and a speech or language handicap and was in need of special education.

On October 31, 1991, November 16, 1992 and November 17, 1993, Individualized Education Program (IEP) meetings were conducted at which the team wrote annual speech and behavior goals and identified Z.S.'s present level of performance. After each meeting, defendant Littlegeorge was sent a "Notice of Intent to Place and Consent for Placement." After the October 1991 meeting, defendant Z.S. was placed in plaintiff's early childhood speech and language preschool program at Spring Hill School.

### B. 1994–95 Reevaluation and Individualized Education Program

During the 1994–95 school year, when defendant Z.S. was six, he was enrolled in kindergarten at a private school, Trinity Lutheran. On February 3, 1995, the principal of Trinity Lutheran School sent defendant Littlegeorge a Notice of Intent to Refer, informing her that defendant Z.S. was being referred to plaintiff for a multidisciplinary team evaluation because of Z.S.'s "severe stubbornness and uncooperation." In addition, the letter stated that defendant Z.S. exhibited "uncontrolled behavior in the classroom," such as "making physical contact with another child or teacher to gain authority, throwing objects, screaming, moving—pushing—tipping over furniture." On March 14, 1995, plaintiff assigned a multidisciplinary team for Z.S., consisting of G. Webb, L. Marston (a speech/language clinician), M. Cunningham (a special education teacher, licensed to teach children with emotional disturbance) and D. Schuette (a teacher).

On April 25, 1995, the multidisciplinary team was convened to complete a reevaluation of defendant Z.S. At that time, the team concluded that Z.S.'s educational performance was "a bit delayed" in fine motor skills, his receptive and expressive language skills were within normal limits, his reading was at the passing level and his cognitive skills were below average for verbal and average for performance. The team noted that Z.S.'s scores might have been on the low side because of "interfering behaviors, such as refusal to cooperate [and] low frustration levels." Defendant Z.S.'s social behavior continued to be "unpredictable," with Z.S. showing "aggressiveness toward others," such as by "hitting, kicking, throwing, attempting to bite & shoving furniture." Z.S. was "sensitive to touch and noise; has outbursts of uncontrollable behavior" and he is "impulsive & does what he wants to do." Once again, the team identified defendant Z.S. as a child with emotional disturbance in need of special education, although the members determined that Z.S. no longer met the eligibility definition of a child with a speech or language handicap. The team noted that "[Z.S.] is demonstrating behaviors that are considered to be severe, chronic & frequent; behavior problems are evident in the home & school settings; behaviors interfere with his social adjustment & peer & adult relationships, academic performance & intrapersonal adjustment."

On May 1, 1995, the IEP team met and wrote goals and objectives relating to defendant Z.S.'s social behaviors. A Notice of Intent to Place and Consent for Placement was sent to defendant Littlegeorge, identifying Z.S.'s placement in plaintiff's

kindergarten program at Spring Hill School in the afternoon and Trinity Lutheran in the morning.

C. *1996—97 School Year Evaluations, Individualized Education Programs and Suspension*

In the summer of 1996, when defendant Z.S. was almost eight, defendant Littlegeorge arranged for him to be evaluated by Dr. Austin Woodard, Psy.D., at the University of Wisconsin Madison Hospital and Clinics. In a report dated July 23, 1996, Dr. Woodard wrote that Z.S.'s behavior has been "steadily worsening over the past year. He quickly angers and then it abruptly subsides.... In the past, his aggressive behavior primarily occurred with boys, but now he is becoming increasingly aggressive with girls and hitting them." Woodard stated that information from Z.S.'s teachers indicated "significant problems with self-regulation associated with conduct disturbance," that the results of the Achenbach Child Behavior Checklist indicated elevated ratings in the areas of aggressive behavior and social problems and that defendant Littlegeorge's response to the [Attention Deficit and Hyperactivity Disorder] Rating Scale indicated that she "endorses symptoms of mixed type [Attention Deficit and Hyperactivity Disorder], with slightly greater indication of the impulsive-hyperactive form of this condition."

Dr. Woodard reported Z.S.'s Composite Intelligent Quotient score as 105, "supporting the impression of high intellectual potential." He provided the following diagnostic summary:

In summary, the presented history, behavior rating data and the neuropsychological profile are consistent with attention deficit hyperactivity disorder of at least moderate severity. This alone may not account for his problems and consideration of a mood disorder or bipolar will be given additional consideration.

On August 27, 1996, plaintiff's Director of Pupil Services J. Ferris assigned another multidisciplinary team to consider Z.S.'s need for speech and language services in response to the recommendations of an independent speech pathology evaluation. An IEP meeting was held on August 28, 1996, at the beginning of defendant Z.S.'s second grade school year. At that time, the team added speech and language services to Z.S.'s IEP.

On September 6, 1996, principal Coughlin suspended Z.S. for half a day because he had been throwing objects in the classroom at students, had gone out for recess after being told to stay in, had returned to the class and had continued to be destructive. Z.S. had to be removed from the classroom and put into a police squad car. Another IEP meeting was held on September 9, 1996, at which point the team decided that Z.S. should receive one-on-one instruction with a personal aide outside the regular classroom because of his behavior problems. After plaintiff's occupational therapist, B. Baldwin, evaluated Z.S., the team added as a goal that Z.S. should improve his processing of information.

On October 11, 1996, a meeting was held at the University of Wisconsin Madison Hospital and Clinics. Dr. Woodard summarized the meeting in a letter to child psychiatrist Michael Witkovsky, M.D., University of Wisconsin Madison, Department of Psychiatry, stating

Appropriate medication has not produced dramatic change in his self-control. Critically, [Z.S.] does not seem at all bothered by having to work on a one-to-one basis with an aide. In other words, there is no evidence that he is motivated to return to his former educational placement. [Z.S.] is commanding a great deal of school resources and it is unclear this can continue based on their report today. Critically, [Z.S.]'s

safety and the safety of other students and school faculty remains a concern. The involvement of other students and school faculty remains a concern. The involvement of other authority figures, including the police, has not greatly impacted his behavior.

In his letter to Dr. Witkovsky, Dr. Woodard raised his concern that Z.S. might have pervasive developmental disorder-not otherwise specified or some other multiplex developmental disorder but that he was uncertain of the exact type. Dr. Woodard stated further that "whether [Z.S.] has an autistic spectrum condition or another severe, early onset disorder of childhood remains unclear."

On November 22, 1996, defendant Z.S. received an out-of-school suspension for hitting another student and pushing a teacher when she tried to restrain him. On November 26, 1996, defendant Z.S. became uncooperative in physical education class and threw a bean bag at an adult after hitting a student in the face with a bean bag. Z.S. refused to use the time-out intervention and was sent home because he had been perceived as a potential harm to himself and others.

### D. *1997 Evaluations, Individualized Education Programs and Disciplinary Problems*

An IEP meeting was held on December 2, 1996 and an interim review was conducted on January 27, 1997. The January 1997 IEP shows that Z.S. continued to receive services in the special education classroom with a one-on-one personal aide and that he had annual goals related to his behavior problems.

In spring 1997, disciplinary reports indicate that Z.S. continued to have discipline problems, such as hitting teachers and teacher aides, resisting time-out interventions and refusing to go to the principal's office. On April 11, 1997, an Invitation to an Individualized Education Program Meeting letter was sent to defendant Littlegeorge for another interim review of Z.S.'s program because it was necessary to modify his program.

On April 21, 1997, Z.S. was hospitalized at Meriter Park Hospital in Madison, Wisconsin, for a second inpatient admission "in the context of worsening aggression at school and at home," including hitting, biting and kicking. He had been hospitalized three months earlier. Dr. Witkovsky had been following Z.S. as an outpatient at the University of Wisconsin Outpatient Clinic "for pharmacotherapy and management of his mood and impulse difficulties in the context of his pervasive developmental disorder." Dr. Witkovsky thought that disruptions in Z.S.'s home life gave rise to anxiety, depression and aggressive behavior. In a report dated April 23, 1997, Dr. Witkovsky stated that "A strong mood component was noted during that outpatient admission and the patient has been tried on several anti-depressants." Dr. Witkovsky's initial diagnostic impression of Z.S. was as follows:

AXIS I    (1) Evaluate for reactive attachment disorder
        (2) Major depressive disorder, acute worsening with transition off previous anti-depressant in response to social changes.
        (3) Continue to evaluate for bipolar affective disorder
AXIS II    Pervasive development disorder
AXIS III    No acute medical problems

Dr. Witkovsky did not intend his initial diagnosis of Z.S. to include autism or Asperger's syndrome but he did intend it to include a diagnosis of pervasive developmental disorder-not otherwise specified. Z.S. was discharged from the hospital on May 20, 1997. In a June 11, 1997, discharge summary report, Dr. Witkovsky diagnosed Z.S. as follows

AXIS I    (1) Pervasive developmental disorder; consider Asperger's syndrome
        (2) Reactive attachment disorder.
AXIS II    Deferred
AXIS III    No active medical problems

In his discharge summary, Dr. Witkovsky indicated that Z.S. was to "remain in a

special education program to address the needs of a child with pervasive developmental disorder," but he did not specify any requirements for Z.S.'s educational needs. At the time of Z.S.'s discharge on May 20, Witkovsky placed him on several medications, including Tegretol (to treat his aggression and depression) and Nortriptyline (to treat depression).

Also on May 20, 1997, another IEP team meeting was held, with defendant Littlegeorge, occupational therapist B. Baldwin, LEA representative/principal C. Coughlin, special education teacher J.Schied Gnadt and parent advocate J. Wanless. The team reviewed Z.S.'s progress toward his goals and made needed changes to the plan.

On June 2, 1997, an Individualized Education Program meeting was convened to consider summer special education services for defendant Z.S. According to Z.S.'s program, the purpose of the special education services was to provide Z.S. "with remedial/support services in the basic[ ] areas of reading, spelling, written language and math. The service will be tutorial in structure and will consist of two sessions per week of 90–120 minutes." A Notice of Placement was sent to defendant Littlegeorge on June 2, 1997, indicating Z.S.'s continued placement in special education and the need for an extended school year because of Z.S.'s missed school during his medical treatment and his likely regression during the summer months if he did not attend school.

### E.  1997–98 Individualized Education Programs

In the fall of 1997, when Z.S. was nine, he returned to school in plaintiff district and remained in the elementary school classroom setting for most of the 1997–98 school year. He was in a special education classroom with special education teacher Barbara Lee. Lee did not observe Z.S. having any difficulty communicating with others or understanding them, any delays in the areas of language development or any difficulties in initiating or maintaining conversations with others. Lee never saw Z.S. engage in behaviors such as body rocking, head rolling or head banging and she did not observe him exhibit an inflexible adherence to routines or rituals. Lee did observe Z.S. demonstrate inappropriate affective behavioral responses to normal situations and a pervasive mood of depression, unhappiness and anxiety. She also noticed that Z.S. had a tendency to develop physical symptoms associated with school problems, including headaches and stomach aches and that he withdrew from social interaction and was aggressive. Z.S.'s behaviors were severe and chronic and significantly affected the functioning of other children in Lee's special education classroom.

An IEP meeting was held on October 17, 1997. The team reported that Z.S. had been removed from mainstream education classes because of his "severe emotional disability characterized by hitting, kicking, destroying property; without support services it can be expected that [Z.S.] would cause physical harm to others and may destroy property." Hazelkorn Affid., dkt. # 23, Exh. 39 at 2. Z.S.'s special education program for the 1997–98 school year consisted of instruction in a self-contained, special education resource room with a licensed teacher or outside the resource room with a special education aide. Accompanied by an aide, Z.S. attended classes such as music, physical education and library time. The only time he did not receive this one-on-one support was during art, at which time an aide was available if needed. Z.S. was also receiving occupational therapy and speech and language services. The IEP included annual goals and short-term objectives in the area of social behavior, including a behavior modi-

fication plan with positive reinforcement techniques.

F. *1998 Reevaluation*

In April 1998, the multidisciplinary team conducted a three-year comprehensive re-evaluation of Z.S., completing formal and informal assessments of Z.S.'s progress and present level of performance. Special education teacher Cormican interviewed Z.S.'s third grade teacher and defendant Littlegeorge and conducted an observation of Z.S. in school. Lee reported to the team that Z.S. had made progress over the past year, that he was participating in more general education classes and in two other small instructional groups and that reading was one of Z.S.'s strengths but that his math and writing skills were below his age level. The team reviewed independent medical evaluations of Z.S., including the evaluations that had been conducted by Dr. Woodard and Dr. Witkovsky. The team reported that Z.S. was on multiple medications and noted that Z.S.'s experience in mainstream classes had been positive when he was accompanied by a teaching assistant, that efforts were being made to help Z.S. become more independent, that Z.S. was having significant outbursts an average of two times a month, that Z.S. was having difficulty in unstructured settings and that he was accepting consequences more readily.

On April 20, 1998, defendant Littlegeorge attended a meeting at which she expressed a desire for Z.S.'s learning and social skills to continue to develop but did not express any disagreement with the team's findings. Although the team considered the medical evaluations from Dr. Woodard and Dr. Witkovsky, a University of Wisconsin psychiatrist who had worked with Z.S., some of the team members continued to believe that Z.S.'s dominant problem was his aggressive behavior. Plaintiff reaffirmed its previous conclusion that Z.S. continued to be eligible for spe-

cial education and related services as a child with emotional disturbance. The team noted that Z.S. "continues to display behavior problems considered to be severe, chronic and frequent, occurring in the home and school environments and which interfere with learning, peer and adult relationships and interpersonal adjustment." Hazelkorn Affid., dkt. # 25, Exh. D 4 at 3. The team considered defendant Z.S.'s needs in the areas of speech and language disability, but concluded that he was not eligible for plaintiff's speech and language program because his expressive and receptive language skills were in the average range. After the team completed the report dated April 20, 1998, Dr. Hazelkorn forwarded the report and the accompanying evaluation reports to Dr. Witkovsky, who reviewed the reports without raising any objections to them.

Dr. Hazelkorn's contract provides that he "agrees to perform at a professional level of competence the services, duties and obligations required by the laws of the State of Wisconsin and the rules, regulations and policies of the Board which are now existing or which may be hereinafter enacted by the Board." According to Dr. Hazelkorn's job description, he is responsible for "assist[ing] in adopting school policies to include special education needs" and "supervis[ing], coordinat[ing], and evaluat[ing] special education programs ... and recommend[ing] changes...."

G. *1998–99 Placement*

Z.S. returned to school in plaintiff district as a fourth grader from September 1998 until January 1999, with Cormican as his special education teacher. He was ten. Cormican did not observe Z.S. exhibiting any significant difficulties using non-verbal behaviors such as eye contact or facial expressions, initiating or maintaining conversations with others, engaging in any stereotyped behavior or having an inflexi-

ble adherence to routines or rituals. She believed that Z.S. was able to develop appropriate peer relationships and communicate with others and understand them. Cormican observed that Z.S. was demonstrating an inappropriate affective response to normal situations and a pervasive mood of unhappiness, depression and anxiety and developing physical symptoms associated with school problems, such as headaches and stomach aches. Cormican noted that Z.S. withdrew from social interaction and was aggressive. She believed that Z.S.'s behaviors had an adverse effect on other children in her classroom.

Because of an increase in Z.S.'s aggressive behaviors, defendant Littlegeorge made arrangements in January 1999 to have him placed at the Mendota Mental Health Institution, a residential treatment facility located in Madison, Wisconsin. While hospitalized at Mendota, defendant Z.S. attended Pioneer School on the Mendota campus. Mendota's supervising psychologist, Dr. Ed Musholt, evaluated Z.S. and found that he was performing in the average range in both verbal and nonverbal intellectual functioning, was reading above his grade level, had participated appropriately in group therapy and could identify emotions in himself and others. Dr. Musholt found that Z.S. was overly influenced by his emotions and such influence caused him difficulties and that the common themes in Z.S.'s evaluations included his anxiety, aggression, depression and rejection. In his report, Dr. Musholt diagnosed Z.S. with the following:

Axis I: 313.89 Reactive Attachment Disorder (Mixed Approach Avoidance)
300.00 Anxiety Disorder–NOS (Mixed Anxiety–Depressive Disorder, with Obsessive Compulsive Features)
314.90 Attention Deficit Hyperactivity Disorder (Combined type)

Rule-out: 298.90 Psychotic Disorder–NOS
299.80 Pervasive Developmental Disorder–NOS

Axis II No Disorder

Defendant Z.S. remained hospitalized at Mendota from January 1999 until August 1999, receiving instruction at Mendota's Pioneer School. His teachers were Joy Becker and Jessica Bilke. While at Pioneer School, Z.S.'s educational program was based on the IEP that had been prepared by plaintiff. Z.S.'s classroom at the Pioneer School consisted of approximately 6 students. Z.S. received 4½ hours of classroom instruction each school day. At times, Z.S. was defiant and disruptive, refused to do his academic work and had difficulty getting along with his peers. At those times, he was given a range of consequences; if these strategies did not work, he was placed in a locked room. At the time Z.S. left Mendota in August 1999, his teacher believed that Z.S. had been successful at the Pioneer School, that he had received some educational benefit from his time there and that he needed an environment with clear guidelines and consequences.

In a report dated August 26, 1999, Dr. Musholt diagnosed Z.S. with the following:

310.1 Personality Change Due to Sleep Apnea–Combined Type
299.80 Pervasive Developmental Disorder-[Not Otherwise Specified]

Dr. Musholt attributed a majority of Z.S.'s problems to sleep apnea. Dr. Musholt's diagnosis that Z.S. had pervasive developmental disorder was supported by his observations of Z.S.'s behavioral rigidity and difficulty in forming relationships with his peers. In his August 26 report, Dr. Musholt stated that "Pervasive Developmental Disorder NOS remains a rule-out diagnosis at this time. It is not clear to what extent [Z.S.]'s behavior will change given on-going treatment of sleep apnea."

H. *1999–2000 Individualized Education Programs, Placements and Behavioral Problems*

On August 27, 1999, an IEP meeting was held at Mendota to discuss Z.S.'s

placement for the 1999–2000 school year. At the meeting, Dr. Hazelkorn expressed concerns about changing Z.S. from a 24-hour a day residential facility to a regular education setting. Staff from Mendota were adamant about returning Z.S. to the regular education setting and defendant Littlegeorge supported moving Z.S. to a less restrictive environment. During the meeting, the Mendota staff, including Joy Becker, told plaintiff that Z.S. was not aggressive toward either staff or other students, that Z.S. did not initiate aggression and that he backed off if challenged. The IEP team agreed upon Z.S.'s placement in the plaintiff school district but Z.S. was not discharged formally from Mendota so that he could be returned there if things did not go well.

On September 1, 1999, Z.S. began attending school at plaintiff's Lake Delton Elementary School. He was eleven years old and in fifth grade. The team prepared a thirteen-page IEP for the school year after determining that Z.S. would receive instruction in the regular education setting 70% of the time with Patricia Notes as his regular classroom teacher and receive special education services 30% of the time with Laura Devine in the special education classroom, which had between two and ten students. Z.S. was to receive one hour of occupational therapy each week with Jennifer Anderson. Diane Blum, a special education program assistant, was to work with Z.S. in his regular and special education classrooms. The team noted that the placement at Lake Delton provided the appropriate "degree of control of environment and educational variables that [Z.S.] needs during certain academic subjects." It added that Z.S. required small group instruction, one-on-one assistance during language arts and alternative teaching strategies. The plan included an extensive behavioral intervention program, including descriptions of the classroom rules and behaviors Z.S. would be learning (such as

following directions and getting along with peers and teachers), identification of positive reinforcers and explanations of the consequences for inappropriate behavior.

Z.S. did not attend Lake Delton on a consistent basis; he attended school on only eight days in September. Z.S. was disruptive on several occasions in Devine's special education classroom. When this happened, Devine used a number of supplemental aids and strategies suggested by the Mendota staff and methods set forth in the behavior intervention plan. Devine also sought advice from Z.S.'s former teacher at Mendota, Joy Becker, and communicated regularly with defendant Littlegeorge. Z.S.'s outbursts continued, affecting his own ability to learn as well as that of others. Other students were concerned about where he was and what he was doing.

Z.S. did not attend school the week of September 6, 1999, but he returned on September 13. On September 16, Z.S. kicked a little girl who was playing on the playground and refused to go into the school building. Following his return to the classroom, Z.S. refused to do anything academic. When Devine attempted to engage Z.S. in a discussion about his behavior, Z.S. quit talking suddenly, tore up the paper that he was working on and left the room. In science class, Z.S. began breaking pencils and throwing pieces at other students in the classroom. During the noon recess, Z.S. attacked several children, grabbing them by the neck, scratching them and throwing them to the ground. According to a report by Diane Blum, Z.S. hurt several students at random with no provocation and damaged other students' bicycles, despite the efforts of Blum and guidance counselor Cameron Goetz to persuade him to stop. When the police arrived to take control, Z.S. struggled with them and kicked them. He then damaged

the back seat of the police vehicle in which he was placed. At the request of defendant Littlegeorge, Z.S. was transported back to the Mendota Mental Health Institute for admission. As a result of these incidents, Z.S. was suspended from school for three days.

Following Z.S.'s return to Mendota, Dr. Hazelkorn talked to Dr. Musholt at Mendota about alternative placement options for Z.S. Dr. Hazelkorn also contacted Fred Wollenberg, Director of Special Education, Cooperative Educational Service Agency # 5, to see what placement options might be available to Z.S. in the geographical area. Wollenberg referred Hazelkorn to John Bemis, Coordinator of Alternative Programs for the service agency. In their discussions, Bemis and Hazelkorn talked about placing Z.S. at the Columbia and Marquette Adolescent Needs Program or the Sauk County Adolescent Needs Program. Bemis was familiar with Z.S.'s case and thought that the Sauk County program was better run, the chemistry of the students at the Sauk County program was better for Z.S. and Sauk County's lead teacher, Miriam Miller, was experienced and would be able to work with Z.S. The purpose of the Sauk County program is to reintegrate its students back into the public schools. Most students who attend the Sauk County program have been unsuccessful in the regular education setting because of emotional, social or academic needs related primarily to an emotional or behavior disability. The Sauk County program was less restrictive than Mendota because it was not a residential placement.

The Mendota staff participated in the decision to place Z.S. at the Sauk County program. Dr. Musholt and defendant Littlegeorge thought that the Sauk County program would be a good place for Z.S. and Bemis thought that the program was the best way to get Z.S. back into public school. During a visit to the Sauk County program, Dr. Musholt, Z.S. and his social worker at Mendota, Susan Edwards, all reacted positively to the program. Although the program's staff expressed some concerns that Z.S. was younger than most of the program's students, there was a consensus that the program could probably help Z.S.

On October 18, 1999, the Individualized Educational Program team met and developed an IEP for implementation at the Sauk County program. Z.S. was not discharged from Mendota before his enrollment in the Sauk County program. His teacher at Sauk County, Miriam Miller, understood that Z.S. could return to Mendota if the Sauk County placement did not work out. While a student at the Sauk County program, Z.S. received academic instruction for approximately three hours each day, in the areas of math, reading, social studies, science, human relations, social skills, anger management, career education and physical education. There were approximately seven students in Z.S.'s classes. The Sauk County program was structured and staff-intensive.

On his third day at the Sauk County program, Z.S. was disruptive. During a writing assignment, he had to be removed from the classroom and taken to the time-out area. Later in the day, Z.S. was given a detention, which he refused to serve, shoving chairs in the cafeteria. Twice in the first week, Miriam Miller had to physically restrain Z.S. for approximately 10–15 minutes. During his second week, Z.S. had several difficult days, throwing a pencil at another student, taking a basketball away from another student and refusing to do written work during class. He had to be restrained physically because he would not get up from his desk. When directed to do so, he started howling, sat on top of his desk and ripped his T-shirt. Z.S. was sent home after this incident. At times

during the first two weeks, Z.S. had tantrums and needed one to two staff members to control him. On several occasions he refused to go to the time out area when directed to do so. To address Z.S.'s behavioral problems, a decision was made that Z.S. would attend school only two days during the third week and work with staff one-on-one. This strategy was not successful. When Z.S. discovered he was to be in a room without other students, he lost control of his temper, damaged an outside window and screen and had to be sent home.

On November 11, 1999, personnel from the plaintiff school district met with representatives of the Sauk County program and Mendota and defendant Littlegeorge to discuss Z.S.'s continued placement in the Sauk County program. The program's staff believed that the program was not working for Z.S. Defendant Littlegeorge opposed Z.S.'s return to Mendota or continued attendance at the Sauk County program. Although a number of options were discussed, nothing was decided. The Sauk County program remained open to Z.S. Miller made several efforts to persuade defendant Littlegeorge to return Z.S. to Sauk County.

Defendant Littlegeorge did not bring Z.S. back to the Sauk County program after November 11, 1999. On November 12, 1999, Dr. Hazelkorn solicited ideas from Wollenberg, Heidi Pendleton (a Juneau County social worker who was Z.S.'s case manager), Steve LaVallee (the director of special education for the Adams–Friendship School District) and Jerry Bohren (the director of pupil services for the Stevens Point Area School District). After Hazelkorn was unable to find any placement alternatives for Z.S., he contacted Dr. Musholt at Mendota to see whether Z.S. could be returned there on an interim basis. Defendant Littlegeorge did not want to send Z.S. back to Mendota.

Hazelkorn convened an IEP meeting for December 10, 1999, to review and revise Z.S.'s IEP and to discuss Z.S.'s placement. The participants at the meeting included defendant Littlegeorge and her lawyer, Linda Hale; plaintiff's lawyer, Peter Martin; Dr. Hazelkorn; John Bemis; Miller from Sauk County; P. Notes (fifth grade teacher); L. Devine (special education teacher); J. Anderson (the occupational therapist); and P. Robinson and J. Huber (two social workers from Northland Community Services). The meeting lasted over four hours and every participant was given an opportunity to express his or her views. At the meeting, defendant Littlegeorge asserted that Z.S. had autism, that no one in the school district knew how to deal with autism, and that as a result, plaintiff had been providing Z.S. with inappropriate programming. Bemis stated that returning Z.S. to the public schools without a transition period could do permanent damage to his ability to interact with peers unless he developed skills to control his anger first.

The IEP team, including defendant Littlegeorge, decided to place Z.S. in a homebound instructional placement, where he would receive six hours of instruction each week from Gerry Potter, a certified special education teacher, and an hour of occupational therapy from Jennifer Anderson. Z.S.'s IEP continued to focus on his aggressive behavior. One of the goals in Z.S.'s plan was for him to return to school five days a week.

Following the December 1999 team meeting, Hazelkorn responded to defendant Littlegeorge's concern about plaintiff's lack of knowledge about children with autism by consulting with Kathy Van Leuven, an autism specialist recommended by Hale and Littlegeorge. Hazelkorn also contacted other school personnel knowledgeable about autism. After discussing

the matter with several individuals and with members of the Individualized Education Program team, Hazelkorn concluded that additional testing was needed to determine whether Z.S. continued to exhibit characteristics of a child with an emotional disturbance or whether he suffered from autism. Plaintiff made three unsuccessful attempts to obtain defendant Littlegeorge's consent to allow plaintiff to conduct additional testing. Defendant Littlegeorge told Hazelkorn that plaintiff would not be allowed to test Z.S. and that she believed that plaintiff had all the information it needed to determine Z.S.'s disability.

Z.S.'s new IEP was implemented immediately after the December 1999 meeting. On December 13, 1999, Gerry Potter began providing instruction to Z.S. and on December 16, Jennifer Anderson had her first occupational therapy visit with Z.S. Potter is an experienced special education teacher with a master's degree in emotional disturbance. Potter prepared a schedule and materials for Z.S., including a description of the subjects in which he was to receive instruction. Potter left assignments for Z.S. to complete during the days she did not visit him. During his homebound placement, Z.S. received a number of socialization opportunities, including visiting a grocery store, a Burger King and a gas station, where he bought food for himself and his grandparents. Potter also took Z.S. swimming so he could have an opportunity to interact with children closer to his age. Z.S. was given several opportunities to attend field trips at the end of the school year, including trips with Lake Delton fifth graders to the Tommy Bartlett water ski show, to Ponderosa Steak House and to the movie theater.

Potter and Anderson provided Z.S. with instruction until the end of the school year in June 2000. During the course of his homebound instruction, Z.S.'s grades improved in five out of six subjects. Potter believed that Z.S. had derived educational benefit from the homebound instruction placement and that he had made progress. Potter noted an improvement in Z.S.'s willingness to do work at academics and his ability to do so. Anderson saw Z.S. make progress towards his occupational therapy objectives and believed that Z.S. was receiving educational benefit from the services she provided. Neither Potter nor Anderson ever had to restrain him physically.

Bonnie McCarty, professor of special education and coordinator of the program in emotional disturbances at the University of Wisconsin Eau Claire, testified that the homebound instruction provided to Z.S. gave him "a chance to interact in a dignified way, to begin back at school fresh with some new skills and not be continually in a position of being—of looking bad to [his] peers." Tr. of Proceedings, July 31, 2000, at 227. She also testified that the six hours of instruction provided was a "whole lot," *id.*, that most school districts provided one to two hours a week, *id.*, and that the plaintiff school district's provision of occupational therapy services showed "an acute awareness of [Z.S.'s] uniqueness" on the part of the IEP team. *Id.* at 223. The consistent provision of occupational therapy showed that "[plaintiff] is not making just a cookie-cutter approach to a label, but it is really individualizing programming for this student." *Id.*

## I. *Administrative Hearing*

Administrative Law Judge Brian Hayes held a bifurcated hearing in response to defendant Littlegeorge's allegations that plaintiff had violated the IDEA by failing to provide Z.S. with a free appropriate public education during the 1999–2000 school year. He devoted the first portion of the hearing to determining whether defendant Z.S.'s disability had been properly

identified. His conclusion was that it had not been because Z.S. had both an emotional disturbance and autism. In the second portion of the hearing, the administrative law judge addressed Z.S.'s Individualized Education Program process and placements. Afterwards, he issued a final decision on August 31, 2000, in which he concluded that plaintiff had not "provide[d] Z.S. with a free and appropriate public education by denying him a placement in the least restrictive environment and by denying him access to the specialized aid and services that he needs to get an educational benefit." *In the Matter of [Z.S.] v. Wisconsin Dells School District*, LEA–00–020, slip op. at 10 (Aug. 31, 2000). He found that

> Taking all three examples together—the failure of the District to provide any specialized education for one month, the District's failure to implement the IEP at the most transitional time in [Z.S.]'s educational program, and the District's failure to understand that a child like [Z.S.] needs another person to help him receive an educational benefit-there has been a denial of access to specialized instruction.

*Id.* at 9. The administrative law judge concluded that the plaintiff school district had met its burden "[i]n regards to the sufficiency of the homebound placement," noting that "[t]here is no doubt that under Ms. Potter's instruction, Z.S. received an educational benefit-as much as can be expected with a home placement." *Id.* at 10. Judge Hayes concluded that defendant Z.S. was the prevailing party in the administrative proceeding. *Id.* at 12.

## OPINION

### A. *Summary Judgment Standard*

#### 1. *IDEA claim and counterclaim*

■ The standard of review of administrative agency decisions under the IDEA is provided by 20 U.S.C. § 1415(i)(2)(B):

> In an action [challenging an administrative decision], the court—
>
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party, and;
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Instead of applying a highly deferential standard of review and treating the state administrative findings as conclusive if supported by substantial evidence, the district court "must independently determine whether the requirements of the Act have been satisfied." *Board of Education of Murphysboro Community Unit School Dist. No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1166 (7th Cir. 1994). "However, because courts do not have special expertise in the area of educational policy, they must give 'due weight' to the results of the administrative decisions and should not substitute 'their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)); *see also Roy and Anne A. v. Valparaiso Community Schools*, 951 F.Supp. 1370, 1373 (N.D.Ind.1997) (describing standard of review as lying "somewhere between the deferential and the de novo"). "'Due weight' necessarily implies some sort of deference" to the decisions of state hearing officers. *Murphysboro*, 41 F.3d at 1167. *But see Board of Education of La Grange School District v. Illinois State Board of Education*, 184 F.3d 912, 917 (7th Cir.1999) (describing court's review of hearing decisions as "extremely deferential").

■ Despite being termed summary judgment, the court's decision is based on

the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(B)(iii). The party challenging the outcome of the state administrative decision bears the burden of proof. *See Board of Education of Community Consolidated School District No. 21 v. Illinois State Board of Education,* 938 F.2d 712, 716 (7th Cir.1991).

2. *Rehabilitation Act claim, § 1983 claim and state law claim*

In resolving these claims, summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Weicherding v. Riegel,* 160 F.3d 1139, 1142 (7th Cir.1998). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B. *Individuals with Disabilities Education Act Claim*

1. *Additional evidence*

Pursuant to 20 U.S.C. § 1415(i)(2)(B), plaintiff has asked this court to consider evidence in addition to the administrative record in deciding its IDEA claim, arguing that the additional evidence is necessary to understand its compliance with the IDEA's procedural safeguards and to provide the court with additional expert opinions. Plaintiff has submitted proposed findings of fact that rely on expert witness reports from Dr. Hugh Johnston, Dr. Andrew Paulson and Joan Hawkinson as well as plaintiff's records that relate to Z.S.'s Individualized Education Programs before the 1999–2000 school year. Defendants oppose the consideration of plaintiff's additional evidence, arguing that the court is not required to consider such evidence because there was no procedural defect in the administrative proceeding. Defendants do not cite any provision of the IDEA that limits consideration of additional evidence to cases in which a procedural defect is alleged.

■ Section 1415(i)(2)(B)(ii) allows a court to "hear additional evidence at the request of a party." The Court of Appeals for the Seventh Circuit has stated that "[a] district court is not required to allow evidence proffered by a plaintiff in an IDEA proceeding.... [T]he determination of whether to allow additional evidence under § 1415(e)(2) 'must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo.*'" *Monticello School District No. 25 v. George L.,* 102 F.3d 895, 901 (7th Cir.1996) (quoting *Town of Burlington v. Department of Education,* 736 F.2d 773, 791 (1st Cir.1984)). The Seventh Circuit has not "spoken with specificity on the issue of when a district court must hear testimony at the request of a party in an IDEA proceeding." *Id.* at 902.

I will consider plaintiff's submission of the school records relating to Z.S. before the 1999–2000 school year because they provide helpful background information, but I will not consider the expert reports from Dr. Johnston or Dr. Paulson because they were prepared after the administrative proceeding, changing the character of this proceeding "from one of review to a trial *de novo.*" *Id.* at 901. Furthermore, I will not consider the report of Joan Hawkinson, which is "limited to defining the diagnostic criteria for educational eligibility under the categories of emotional disturbance and autism as they existed in Wisconsin during the time Z.S.'s educational disability and special education programming was in question." Plt.'s Re-

ply Br., dkt. # 27, at 6. If plaintiff's description of Hawkinson's report is accurate, she has provided information that is available in the relevant state and federal regulations.

### 2. Statutory framework

The Individuals with Disabilities Education Act (formerly the "Education of the Handicapped Act") was passed in 1975 in response to Congress's perception that handicapped children in the United States were being excluded from educational opportunities. *Rowley,* 458 U.S. at 179, 102 S.Ct. 3034 (discussing legislative history of the act). The goal of the IDEA is to insure a free appropriate public education for all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "Under IDEA, a [free appropriate public education] is an educational program 'specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *La Grange School District,* 184 F.3d at 915 (quoting *Murphysboro,* 41 F.3d 1162). The act attempts to achieve this goal by conditioning federal funding on state compliance with a variety of substantive and procedural obligations. 20 U.S.C. § 1412 (establishing eligibility requirements for states to qualify for assistance under IDEA).

The IDEA requires identification and evaluation of children with disabilities that require special services as a result of their disabilities. Once a child has been identified as a child with a disability under the act, the act requires the state to assemble a team to evaluate the child and develop an Individualized Education Program tailored to the unique needs of the child. 20 U.S.C. §§ 1401(11), 1414(d). This IEP, as it is known, sets forth the child's educational level, performance and goals and is the governing document for all educational decisions concerning the child. *Board of Education, No. 218, Cook County*

*v. Illinois State Board of Education,* 103 F.3d 545, 546 (7th Cir.1996). The school district must determine the child's category of eligibility in accordance with both federal and state regulations. 34 C.F.R. § 300 .7; Wis. Admin. Code ch. PI 11.

The Supreme Court has held that a court's inquiry in suits brought under the IDEA is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. This inquiry includes the determination whether the state has created an Individualized Educational Program that conforms with the requirements of the act. *Id.* at 207 n. 27, 102 S.Ct. 3034. "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro,* 41 F.3d at 1166.

### 3. Review of administrative law judge's decision

Plaintiff school district contends that it is entitled to summary judgment on its claim that the administrative law judge erred in reaching his conclusions that Z.S. was a child with both an emotional disability and autism and that plaintiff did not provide Z.S. with a free appropriate public education during the 1999–2000 school year. For the same reasons, plaintiff argues that defendants' IDEA counterclaim should be dismissed. (Except that defendants may have thought they could recover monetary damages if they brought suit in federal court under the IDEA, it is unclear why they filed a counterclaim under the IDEA after they had succeeded at the

administrative level. Defendants need not bring a counterclaim in order to recover attorney fees under 20 U.S.C. § 1415(i)(3)(B); that section provides that, "[i]n any action or proceeding brought under this section, the court in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.")

a. Identifying Z.S.'s disability

■ It is not clear why the administrative law judge devoted two days of hearing time to determining the "proper" identification of Z.S.'s disability, when there was no apparent need to do so. No one disputes the fact that Z.S. is a child with a disability as defined by the IDEA. Since Z.S. was first evaluated at age three, he has been classified as having a qualifying emotional disturbance and provided services, as mandated by the IDEA for children with disabilities. The people who have worked with Z.S. agree that he meets the characteristics of emotional disturbance under the IDEA regulations. 34 C.F.R. § 300.7(c)(4) defines emotional disturbance as follows:

a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

Not only does Z.S. meet all but one of the criteria for emotional disturbance (he is able to learn), making him eligible for services, the correctness of his label is essentially irrelevant under IDEA. "Nothing in the Act requires that children be classified by their disability so long as each child who has a disability listed in § 300.7 and who, by reason of that disability, needs special education and related services is regarded as a child with a disability." 34 C.F.R. § 300.125(d). *See also Heather S. v. Wisconsin,* 125 F.3d 1045, 1055 (7th Cir.1997) ("The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate public education."). The only legal question raised in this case is whether Z.S. was given the proper services, not whether he qualifies for services.

Having decided to hold a hearing, the administrative law judge never clarified the purpose of pinning down the correct classification of Z.S.'s disability. If it was not needed to qualify Z.S. for services under the IDEA, presumably it was to enable the judge to evaluate the fit between Z.S.'s disability and the services provided by the plaintiff school district so that the administrative law judge could determine the adequacy of those services. If that was the purpose, the administrative law judge should have confined his analysis to the information that was available to the plaintiff school district when it made the decisions at issue. He did not do this and the resulting analysis was flawed.

In reaching the conclusion that Z.S.'s disability came within the regulations' definition of autistic disorder, the administrative law judge began with the fact that beginning in mid 1996, doctors who evaluated defendant Z.S. had suggested the possibility that he might suffer from a pervasive developmental disorder-not otherwise specified. *See In the Matter of*

*[Z.S.]*, LEA 00–020, slip op. at 2–3 (July 21, 2000). From the *Diagnostic and Statistical Manual of Mental Disorders* 69–84 (4th Ed.2000), the administrative law judge learned that pervasive developmental disorder-not otherwise specified is one of five types of pervasive developmental disorders. (The others are Autistic Disorder, Rett's Disorder, Childhood Disintegrative Disorder and Asperger's Disorder. *Id.*)

The administrative law judge acknowledged that the terms pervasive developmental disorder or pervasive developmental disorder-not otherwise specified do not appear in the federal regulations. *In the Matter of [Z.S.]*, slip op. at 5. He concluded, however, that their omission did not mean that the regulators intended to exclude children diagnosed with pervasive developmental disorder-not otherwise specified from eligibility for special education services. *Id.* He found that this was a logical inference drawn from the suggestion made by the Office of Special Education Programs in the United States Department of Justice that children with pervasive personality disorder could require special services and that educators should look at the child's disability and address the services that are needed. *See Letter to Coe*, 32 IDELR 204 (June 28, 1999). From this, the administrative law judge concluded that autism, as defined in 34 C.F.R. § 300.7(c)(1)(i),

> is synonymous with the disorders included in the definition of Pervasive Developmental Disorder included in the DSM IV Manual, also referred to as the 'autism spectrum'. A child with PDD NOS would exhibit behavior that should be classified as a form of Autism described in 34 C.F.R. § 300.7(c)(1)(i).

*In the Matter of [Z.S.]*, slip op. at 5. He did not explain how he arrived at this conclusion. It is not based on the Coe letter cited in his order; in that letter, the Office of Special Education said only that

While [the IDEA] does not explicitly mention [Pervasive Developmental Disorder], we believe that a child with [Pervasive Developmental Disorder] could be found eligible for services under [the IDEA] if, through an appropriate evaluation, the team determines that the child's condition meets one of the disability categories described in § 300.7 ... and because of that disability, the child needs special education and related services.... [A] child [with Pervasive Developmental Disorder] who does not meet the definition and diagnostic criteria for autism, may meet the definition and diagnostic criteria for another disability category, such as other health impairment.

32 IDELR 204. The administrative law judge's conclusion that a child with Pervasive Developmental Disorder Not Otherwise Specified would exhibit the same behavior and educational needs as a child with autism is not based on any evidence in the record. It is not based on any diagnoses made by the doctors who evaluated Z.S., because none of them diagnosed Z.S. as having autism. Dr. Witkovsky speculated that Z.S. might have Asperger's; he never suggested that Z.S. was autistic. Moreover, the administrative law judge's conclusion takes no account of the directive in the *Diagnostic and Statistical Manual of Mental Disorders* that pervasive developmental disorder-not otherwise specified is a condition to be diagnosed only when none of the more specific disorders such as autism or Asperger's is present. *Id.* at 84.

The administrative law judge observed that Z.S. exhibited the behavior listed in the regulation under the term autism: he did not like to be rushed or threatened and was sensitive to touch and noise. He preferred structure, routine and predictability. In the administrative judge's view, this behavior "comports with the autism

definition that children be resistant to environmental change and have unusual responses to sensory experiences." *In re Matter of [Z.S.],* slip op. at 5.

The regulations state explicitly that the term autism does not apply "if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (b)(4) of [§ 300.7]." 34 C.F.R. § 300.7(c)(1)(i). *See also* Wis. Admin. Code § PI 11.36(8) (formerly PI 11.35(2)(i)(1)). Defendant Z.S. has always been identified as having an emotional disturbance. The administrative law judge dealt with what might seem like a bar to a finding that Z.S. has autism by saying that the "regulations apparently anticipated this co-morbidity [having both autism and emotional disturbance] when they drafted the autism definition." *In the Matter of [Z.S.],* slip op. at 6. He did not explain the concept of co-morbidity or why the language in the regulation showed that the drafters had anticipated such a concept when they wrote that a finding of one precludes a finding of the other.

The administrative law judge did not stop at finding that Z.S. fit the legal definition of autism under the regulations. He determined that Z.S. has autism for medical and educational purposes. This exceeded the bounds of his authority, knowledge and experience; he is not equipped to make a finding no doctor has ever made.

The administrative law judge's conclusion that Z.S. should be classified as a child with autism as well as emotional disturbance could be ignored if it were not for the large part this determination played in the administrative law judge's evaluation of plaintiff's efforts to help Z.S. Having decided that Z.S. suffers from autism, not just that he came within the legal definition of autism, he looked at plaintiff's efforts to help Z.S. through that lens. Because I am persuaded that the administrative law judge erred in reaching the legal conclusion that Z.S. fits the definition of autism in § 300.7(c)(1)(i), I will not give any weight to his evaluation of the services plaintiff provided to Z.S. to the extent that his opinion rests on his unsupported determination that Z.S. actually suffers from autism.

b. Free appropriate public education

■ The central issue in this case is whether plaintiff provided defendant Z.S. with a free appropriate public education during the 1999–2000 school year. The IDEA requires that plaintiff provide Z.S. with such an education in the least restrictive environment. *See* 20 U.S.C. § 1412(a)(1) and (5). Specifically, the IDEA provides that

> To the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5); 34 C.F.R. 300.550(b)(1) (same). In accordance with this goal, the school district is required to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551. "The school district is required by the statute and regulations to provide an appropriate education, not the best possible education, or the placement the parents prefer." *Heather S.,* 125 F.3d at 1057 (internal citations omitted). The Court of Appeals for the Seventh Circuit has stated that "A school district has met the sub-

stantive requirements of the [IDEA] if its proposed placement is reasonably calculated to be of educational benefit to the handicapped child." *Board of Education of Community Consolidated School District No. 21,* 938 F.2d at 716.

The dispute between the parties centers on the spectrum of services that plaintiff provided in the 1999–2000 school year. Defendants argue that plaintiff failed to provide Z.S. with a free appropriate public education by failing to follow the Individualized Education Program during the time that Z.S. was at the Lake Delton school, by sending him to the Sauk County Adolescent Needs program, by letting him languish for a month after the Sauk County placement failed before convening another IEP team meeting and then choosing homebound instruction when it was not the least restrictive setting possible for Z.S.

The administrative law judge agreed with defendants in large part. He found that the plaintiff school district erred in developing an IEP in August 1999 that was not restrictive enough for Z.S. *In the Matter of [Z.S.],* slip op. at 5 (Aug. 31, 2000). He acknowledged, however, that this plan was developed with the guidance and assistance of the staff at Mendota Mental Health Institute, who had been working with Z.S. for nine months. He found that plaintiff failed Z.S. when it allowed him on the playground and that "[n]ot one of Z.S.'s attending professionals prior to his enrollment at Lake Delton is at all surprised that Z.S. would be disruptive in the playground setting." *Id.* The administrative law judge found a second inadequacy in the implementation of the IEP for Z.S.: his special education teacher's failure at times "to implement the reinforcers stipulated in the IEP." *Id.* at 6.

Despite the administrative law judge's concern that plaintiff did not have an appropriate IEP in place before Z.S. began the school year at the Lake Delton school and did not implement the IEP it did have, he declined to find that Z.S.'s placement at the Lake Delton school constituted a denial of a free appropriate public education, noting that the Mendota staff had supported it. *Id.* He observed that Z.S.'s placement at the Sauk County Adolescent Needs program was not a good fit because Z.S. was younger than most of the other students; he had different problems from theirs; and he had a problem relating to older children. *Id.* at 7. He noted that Z.S.'s education was even more staff-intensive than was usually the case in the Sauk County program. *Id.*

The administrative law judge found that after the Sauk County placement failed, the plaintiff school district should have known three things about Z.S.: his educational program would have to be staff-intensive; it would have to be with age-appropriate peers; and it would require great structure at the beginning to compensate for Z.S.'s difficulty with transitions and to get his behavior under control. *Id.*

The administrative law judge criticized plaintiff for failing to convene an IEP team meeting as soon as defendant Littlegeorge decided not to send Z.S. back to Sauk County after he was sent home on November 11. *Id.* The administrative law judge found that although plaintiff should have known of Z.S.'s specific needs for intensive staffing, more structure and age-appropriate peers, it continued to seek more restrictive placements outside the school district, rather than considering less restrictive placements with supplemental aids and services, and finally offered defendants the sole option of a homebound placement with six hours of instruction a week. *Id.* In the administrative law judge's opinion, this placement did not meet the prerequisites for a free appropriate public education because it was

not the least restrictive placement possible. *Id.* at 10.

The administrative law judge found that plaintiff failed to show why a child who had started out in the regular classroom for 70% of the time could now be placed only in the most restrictive setting possible or why Z.S. could not be returned to district schools with supplemental services. *Id.* at 7. He added that "[w]hat evidence that was offered showed that [Z.S.] if given a transition period, structure and attention, could benefit from a more inclusive setting—that was both the experience and testimony of [Mendota Mental Health Institute]." *Id.*

Although the courts are directed to give due deference to the administrative decisions in IDEA cases, I am not persuaded that the administrative law judge made the right decision in this case. In my view, his assessment of Z.S.'s readiness to return to the public schools in November or December 1999 is unrealistic and unsupported by credible evidence. For example, in criticizing plaintiff for letting Z.S. on the playground without a personal aide on September 16, 1999, the administrative law judge did not mention that the IEP contained no warning against doing so or any special requirement that Z.S. have an aide during recesses or lunch periods. He did not acknowledge that the Mendota staffers who attended the IEP team meeting in August had told plaintiff's representatives that Z.S. was not aggressive toward either students or staff and that he did not initiate aggression.

The administrative law judge criticized Devine for failing to implement the positive reinforcers consistently, as stipulated in the IEP. *In the Matter of [Z.S.],* slip op. at 7. In finding that she had failed in this respect, he relied on the testimony of Joy Becker, Z.S.'s teacher at Mendota. ("The testimony of Ms. Joy Becker is credible in its specificity on this subject."

*Id.,* at 6.) This was an error. Becker had no personal knowledge of Devine's work at the Lake Delton school. Her testimony was based on inferences she drew from conversations with Devine, who, she testified, had expressed reluctance to use positive reinforcers for Z.S. if they were not made available to all the students in her class. Assuming that Becker is correct that Devine expressed reluctance (she denies having done so), it was not reasonable for Becker or the administrative law judge to have inferred from Devine's statements that in fact she did not implement Becker's suggestions in the few days she was able to work with Z.S.

In finding what plaintiff should have known when the Sauk County placement did not work out for Z.S., the administrative law judge emphasized Z.S.'s need for structure, the need to provide him a staff-intensive program and his need to be with peers of his own age. He did not acknowledge the other information plaintiff would have had from the Sauk County experience: Z.S. continued to have emotional outbursts even in a special program such as Sauk County; his outbursts tended to be unpredictable, intense and often sustained, requiring as many as two staff members to control him at times; and the amount of time staff were required to devote to him was beginning to have an adverse effect on the other students.

The administrative law judge emphasized plaintiff's failure to hold an IEP team meeting until one month after Z.S.'s last day at the Sauk County program, adding that plaintiff

continued to seek more restrictive residential placements outside the boundaries of the school district and beyond its responsibility to provide [a free appropriate public education.] Although these more restrictive placements might have provided an educational benefit,

there was no evidence offered to show that any supplemental aids or services were considered at this point to direct [Z.S.] to a less restrictive placement. The testimony of Dr. Michael Hazelkorn was not credible.

The implication is that Hazelkorn could have held a meeting much sooner had he not been searching for program options that would keep Z.S. out of plaintiff's schools. This is probably true. The administrative law judge saw the delay as revealing Hazelkorn's malevolent motives toward Z.S. An equally persuasive interpretation of Hazelkorn's actions is that the Sauk County experience had convinced him that Z.S. was not ready to return to the public schools, no matter what kinds of services plaintiff provided. Z.S. had had a very structured setting at Sauk County, one-on-one teaching, highly skilled and experienced special education teachers and a high staff-student ratio; none of this had worked for him. Hazelkorn owed it to Z.S. not to put him in another setting in which he would fail; all of the indicators were that he would not succeed in the public schools. Another failure would mean yet another change of placements, which would be detrimental to Z.S., and a failure in the public schools would mean that he would further alienate himself from his peers.

The administrative law judge found plaintiff at fault for letting Z.S. experience a month of idleness after he stopped going to Sauk County. As unfortunate as it is that this educational gap occurred, it is not appropriate to place the blame on plaintiff. Plaintiff had spent considerable time and effort developing an IEP for Z.S. at Sauk County, with the concurrence and cooperation of Z.S., defendant Littlegeorge, staff from Mendota, Sauk County and the school district. That program was still available to Z.S.; he could have attended it if defendant Littlegeorge had permitted him to do so. Hazelkorn needed a reason-

able amount of time not only to convene the IEP team, all of whose members had responsibilities to other children with special needs, but also to obtain the information the team would need to make decisions about the best way to help Z.S. make the transition back to the public school.

Finally, the administrative law judge found that plaintiff violated the IDEA when it provided homebound instruction for Z.S. for the rest of the 1999–2000 school year. He stated that plaintiff had made no attempt to explain why it had chosen this placement after it had "thought that a child that started out, mistakenly, in the regular classroom for 70 percent of the time, could now only be appropriately placed in the most restrictive environment possible." *In the Matter of Z.S.*, slip op. at 7. In saying this, the administrative law judge had to ignore the evidence discussed earlier: the 70% classroom placement had been dramatically unsuccessful despite the assistance of an aide for Z.S. in both his regular and special education classes; Z.S. had reacted to the public school placement with unprovoked violent actions against his peers, the police and school property; and he had been equally unsuccessful in the Sauk County transition program, despite an experienced special education teacher, a high staff-student ratio, a reduction in class time to two days a week and one-on-one teaching. Instead, the administrative law judge relied on the fact that Z.S. had done well at Mendota, saying that this showed that if Z.S. was given a transition period, structure and attention, he could benefit from a more inclusive setting. This was an error. Z.S.'s experience at Mendota did not show he could do well in a different educational setting. Z.S. had had two experiences with structure, transition and attention and had failed to benefit from either experience. Even if the first failure at the Lake Delton school had been the fault of

the school staff, the failure at Sauk County cannot be attributed to staff oversights, inadequacies or inexperience and it cannot be attributed to the older age of the students in the program. Although the age discrepancy at the Sauk County program might have made it hard for Z.S. to gain acceptance from the other students, no one has suggested that it played any part in Z.S.'s tantrums, aggressive behavior or need for physical restraint.

Moreover, a program such as Mendota is not comparable to the kind of program a school district can offer. Mendota is a residential treatment facility. Students are in a highly controlled, regularized setting 24 hours a day, 7 days a week. They are away from any disruptions their home lives may offer. As a hospital, Mendota can employ a range of consequences, including physical restraints and a locked room, that would not be appropriate for a public school.

Defendants have not suggested that plaintiff did not follow the processes required under the IDEA. Defendant Littlegeorge participated in the IEP team meeting that led to the homebound placement. Her lawyer was present as well. She accepted the placement at the time. The persons who made up the IEP team believed that the priority for Z.S. was to gain more control of his emotions, that he was not yet ready to return to the public schools because of his lack of emotional control, that if he returned too soon, it could do permanent harm to his ability to interact with his peers and that a period of homebound instruction with a particularly gifted teacher would offer him both an opportunity to develop more control of his emotions and a chance to continue his education. Although Z.S. would lose the chance for interaction with other students, the team agreed that this priority should give way to the greater priority that he

gain some emotional control before he was returned to a classroom setting.

Although the IDEA promotes the benefits of keeping disabled children in regular classrooms and discourages the removal of children from the public schools, it does not forbid a school district from ever using a placement that is more restrictive than a school setting. 20 U.S.C. § 1412(a)(5). The act recognizes that the nature or severity of the child's disability may be "such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* In Z.S.'s case, it was reasonable in 1999 for the plaintiff school district to find his disability so severe that education in regular classes could not be achieved satisfactorily even with the use of supplementary aids and services. As the undisputed facts show, Z.S. has had a succession of personal aides throughout his years in the plaintiff school district. Their presence has not prevented him from giving in to emotional outbursts, engaging in aggressive behavior and opposing his teachers' efforts to give him academic work. In fact, when Z.S. was nine, he averaged two significant outbursts each month, even with a full-time aide.

The administrative law judge seems to have believed that plaintiff's reluctance to employ a special aide just for Z.S. was motivated by financial concerns. It may be that it would have been more expensive for plaintiff to have hired a full-time aide for Z.S. rather than pay for both an occupational therapist and an experienced special education teacher with a master's degree to work with Z.S. at home. There is no evidence in the record on this point, but it seems unlikely that the cost difference would have been significant. (There is no credible evidence in the record that Hazelkorn opposed a full-time aide because of the cost. Philip Robinson, a psychothera-

pist working with defendant Z.S.'s family testified at the administrative hearing that he *thought* there was a reference to an aide being *too* expensive and he *believed* it was Hazelkorn who said this. Tr. of Proceedings, Aug. 1, 2000 at 426, 443–44. This testimony does not establish that Hazelkorn ever opposed hiring a full-time aide because of the cost.)

Moreover, a review of Z.S.'s school records shows that cost has never been a consideration in plaintiff's efforts to help Z.S. He has been provided full or nearly full-time aides, one-on-one teaching, special education classes, speech and language therapy, occupational therapy, special summer school and multiple IEPs in response to changes in his needs. In the 1996–97 school year alone, plaintiff convened a IEP team five different times to review his needs and modify his IEP.

Before finding inadequate the services a school district has provided to a student, a hearing examiner or a court must be able to cite credible evidence that the choice the school district made cannot be justified. It is not proper for either the examiner or the court simply to substitute its judgment for that of the school district. In this case, plaintiff made the decision that it was necessary to give priority to one of Z.S.'s three most urgent needs: gaining control of his anger; obtaining an education; and learning to interact with his peers. Plaintiff had legitimate reasons for giving priority to anger control after observing the havoc that Z.S.'s uncontrollable outbursts wreaked on his ability to learn and on his ability to behave appropriately when with his peers. It was not error for plaintiff to decide that Z.S. would make no real progress on his other needs if he did not learn anger control and it was not error to decide that this could not be done within the Lake Delton school, given the experiences Z.S. had had there and at Sauk County.

I conclude that plaintiff has met its burden of demonstrating that the administrative law judge erred in holding that plaintiff had failed to provide Z.S. with a free appropriate public education during the 1999–2000 school year. Plaintiff complied with all procedural requirements under the IDEA in developing Z.S.'s IEPs. The IEPs were reasonably calculated to provide him with some educational benefit in the least restrictive environment that could meet his unusual and complex needs. That one month elapsed between the time that defendant Littlegeorge decided not to send Z.S. back to Sauk County and the convening of a new IEP team meeting was not a violation of the IDEA, given the facts that Z.S. had a placement option still open to him and that it would necessarily take some time to explore alternative options and convene a team meeting.

Plaintiff's motion for summary judgment will be granted; as a result, defendants are not prevailing parties under the IDEA. Therefore, they are not entitled to attorney fees under 20 U.S.C. § 1415(i)(3)(B). Judy Littlegeorge's separate suit for attorney fees will be dismissed as moot.

## C. *Section 504 of the Rehabilitation Act*

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." Initially, the Rehabilitation Act did not provide an enforcement mechanism, but Congress added § 505(a)(2) as an enforcement provision in 1978, 29 U.S.C. § 794a(a)(2), which the Supreme Court has interpreted as granting an implied private cause of action. *Franklin v.*

*Gwinnett County Public Schools,* 503 U.S. 60, 72–73, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

Defendants contend that plaintiff violated § 504 of the Rehabilitation Act, arguing that Dr. Hazelkorn decided to keep Z.S. out of school in plaintiff district solely because of his disability. "[S]ection 504 is prohibitory, forbidding exclusions from federally-funded programs on the basis of handicap, rather than mandatory, creating affirmative obligations. The [IDEA], by contrast, because of its focus on appropriate education, imposes affirmative duties regarding the content of the programs that must be provided to the handicapped." *Timms v. Metropolitan School District,* 722 F.2d 1310, 1317–18 (7th Cir.1983) (discussing the predecessor to the IDEA, the Education for All Handicapped Children Act). "Because section 504 forbids exclusion from programs rather than prescribing the programs' content it reaches grosser kinds of misconduct than the [IDEA]." *Id.; see also Wenger v. Canastota Central School District,* 979 F.Supp. 147, 152 (N.D.N.Y.1997) ("[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."); *Brantley v. Independent School District,* 936 F.Supp. 649, 657 (D.Minn.1996) (" § 504 provide[s] relief from intentional discrimination whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination."). Because I conclude that plaintiff provided Z.S. with a free appropriate public education during the 1999–2000 school year, defendants' claim under the Rehabilitation Act fails necessarily. It is not possible to prove that any failure of plaintiff is attributable to discriminatory animus or that it was intentional in light of the conclusion that plaintiff did not fall short of obli-

gations under the IDEA. Plaintiff's motion for summary judgment on this claim will be granted.

### D. *Section 1983*

Defendants have brought a § 1983 counterclaim against plaintiff; however, they have failed to specify what constitutional right or federal law plaintiff allegedly violated. Section 1983 is a procedural vehicle that provides a cause of action for violations of federal statutes as well as the federal Constitution. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Assuming that defendants' § 1983 claim is based on violations of the IDEA and Rehabilitation Act, plaintiff contends that the claim should be dismissed because plaintiff cannot be held liable under the doctrine of respondeat superior for Hazelkorn's actions. With the dismissal of defendants' IDEA and Rehabilitation Act claims, there is nothing left of this claim. However, for the sake of completeness, I will discuss plaintiff's respondeat superior defense.

██ Under § 1983, actions of a municipality's "employees are attributable to the [municipality] itself if those actions are in furtherance of the entity's 'policy or custom.'" *Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180, 1188 (1986). The Court of Appeals for the Seventh Circuit has identified three instances in which such a "policy" or "custom" exists:

(1) an express policy that, when enforced, causes a constitutional deprivation (citing *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978));

(2) a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law" (*citing City of St. Louis v. Praprotnik,* 485 U.S. 112,

127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)) (plurality opinion) (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); or

(3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority' (*citing Praprotnik*, 485 U.S. at 123, 108 S.Ct. 915; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)).

*See Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir.1994). Defendants contend that this case falls within the third instance, arguing that Hazelkorn has final policymaking authority. "Only those officials who possess the requisite policymaking authority are capable of establishing 'official policy.'" *Cornfield by Lewis v. Consolidated High School District No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993). "The exercise of discretion by a particular official, standing alone, does not give rise to municipal liability. Municipal liability should attach only if the unconstitutional decision was 'a deliberate choice to follow a course of action' and if state or local law authorized the decisionmaker 'responsible for establishing final government policy with respect to the subject matter in question.'" *Id.* at 1325. The Supreme Court has confirmed that final policymaking authority is a question of state law. *See City of St. Louis*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107; *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

■ An examination of Wisconsin state law demonstrates that Hazelkorn is not a final policymaker for plaintiff district. Wis. Stat. § 120.12(1) states, "The school board of a common or union high school district shall: Subject to the authority vested in the annual meeting and to the authority and possession specifically given

to other school district officers, have the possession, care, control and management of the property and affairs of the school district...." Wis. Stat. § 118.24 sets forth the responsibilities of school district administrators. For example, Wis. Stat. § 118.24(2)(a) states that "Under the direction of the employing school board, the school district administrator shall have general supervision and management of the professional work of the schools and the promotion of pupils." Similarly, Wis. Stat. § 118.24(2)(c) provides that "The school district administrator shall make written recommendations to the school board on teachers, courses of study, discipline and such other matters as the administrator thinks advisable...." Hazelkorn's contract and job description indicate that he answers to the school board. Because Hazelkorn does not have final policymaking authority, plaintiff cannot be held liable for his actions under § 1983. Plaintiff's motion for summary judgment on this claim will be granted.

### E.  *Negligent Hiring*

■ Plaintiff contends that defendants' state law counterclaim should be dismissed because plaintiff is immune from suit for its discretionary acts under Wis. Stat. § 893.80(4). Defendants have failed to respond to plaintiff's motion for summary judgment on this claim. "Arguments that are not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999); *see also Finance Investment Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 528 (7th Cir.1998); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 593 (7th Cir.1992) ("[plaintiffs] cannot leave it to this court to scour the record in search of factual or legal support for this claim"); *Freeman United Coal Mining Co. v. Office of Workers'*

*Compensation Programs, Benefits Review Board,* 957 F.2d 302, 305 (7th Cir.1992) (court has "no obligation to consider an issue that is merely raised, but not developed, in a party's brief"). In any event, there can be no liability for negligent hiring in the absence of a showing that Hazelkorn did anything wrong. Plaintiff's motion for summary judgment on this claim will be granted.

### F.  *Availability of Damages*

Plaintiff contends that the Seventh Circuit's decision in *Charlie F. v. Board of Education,* 98 F.3d 989 (7th Cir.1996), bars defendants' request for compensatory and punitive damages under the IDEA. Because defendants' counterclaims under the IDEA, § 504 of the Rehabilitation Act and § 1983 will be dismissed, I need not reach the issue whether compensatory or punitive damages are available for those statutory violations.

### ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by plaintiff School District of Wisconsin Dells in case no.  00–C–0619–C is GRANTED on plaintiff's claim under the Individuals with Disabilities Education Act and GRANTED as to the counterclaims filed by defendants Z.S. and Judith Littlegeorge.

2.  Case no.  00–C–0662–C is DISMISSED as moot.

3.  The clerk of court is directed to enter judgment for plaintiff in case no. 00–C–0619–C and close the case.