TAMMY S., as mother of and on
behalf of her minor child,
Jordan S., Plaintiff,

v.

REEDSBURG SCHOOL DISTRICT,
Defendant.

No. 03–C–37–C.

United States District Court,
W.D. Wisconsin.

June 27, 2003.

Jeffrey Spitzer–Resnick, for Plaintiff.

Joann M. Hart, Melli, Walker, Pease & Ruhly, S.C., Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action in which plaintiff Tammy S. is suing on behalf of her son Jordan to obtain the reversal of an administrative law judge's decision in defendant Reedsburg School District's favor under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1487. *See* 20 U.S.C. § 1415(i)(2)(A). Plaintiff maintains that the judge erred in finding that (1) defendant's placement offer for Jordan during the 2002–03 school year provides him with a free appropriate public education in the least restrictive environment; (2) defendant properly evaluated Jordan's communication needs and offered him an individualized education plan for 2002–03 that provided him a free appropriate public education with respect to those needs; and (3) Jordan is not entitled to compensatory education because from January to June 2002, and for the duration of the 2002–03 school year, defendant offered Jordan a free appropriate public education through an appropriate individualized education plan that plaintiff rejected. In addition, plaintiff seeks an order declaring that defendant's proposed placement of Jordan at the Wisconsin School for the Deaf shortens the length of his academic program solely on the basis of his deafness, in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The case is presently before the court on plaintiff's motion for summary judgment and defendant's motion to strike plaintiff's expert reports.

I will affirm the administrative law judge's decision in all respects because I agree that defendant's placement offer for the fall semester of 2002 and for the 2002–03 school year provided Jordan with a free appropriate public education in the least restrictive environment and that defendant properly evaluated Jordan's communication needs. Although defendant did not file its own motion for summary judgment, I will enter summary judgment for defendant on plaintiff's Individuals with Disabilities Education Act claims on the court's own motion, as is permitted where the record reveals that the non-moving party is entitled to judgment. *See Borcherding–Dittloff v. Corporate Receivables, Inc.,* 59 F.Supp.2d 822, 826 (W.D.Wis.1999); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 347 (3d ed.1998) (summary judgment may be entered in favor of non-moving party even though no formal cross-motion has been filed). In addition, I will grant defendant's request to terminate Jordan's current stay-put placement. I will also deny plaintiff's request for compensatory education for the one hour each day that Jordan did not have an interpreter at some point during the fall semester of 2002. The administrative law judge never ruled on this request. The terms of the request are too vague and the record too undeveloped for the court to order the requested relief. Finally, I will grant defendant summary judgment on plaintiff's Rehabilitation Act claim.

MOTION TO STRIKE

Defendant has moved to strike four expert reports submitted by plaintiff in support of her motion for summary judgment. Plaintiff did not submit any of the reports to the administrative law judge during the administrative due process hearing in this case, although the authors of two of the reports testified at the hearing. In an appeal such as this one, the Individuals with Disabilities Education Act (IDEA) provides that the district court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(B)(ii). However, the Court of Appeals for the Seventh Circuit has stated that "[a] district court is not required to allow all evidence proffered by a plaintiff in an IDEA proceeding.... [T]he determination of whether to allow additional evidence under [§ 1415(i)(2)(B)(ii) ] 'must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*.'" *Monticello School District No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996) (quoting *Town of Burlington v. Department of Education*, 736 F.2d 773, 791 (1st Cir.1984)). The court of appeals has not "spoken with specificity on the issue of when a district court must hear testimony at the request of a party in an IDEA proceeding." *Id.* at 902. However, in deciding whether to consider evidence that was not presented during the administrative hearing, "a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason [a] witness did not testify at the administrative hearing, and the conservation of judicial resources." *Burlington*, 736 F.2d at 791.

I will grant defendant's motion to strike the expert report of Amy Otis–Wil-

born and the report coauthored by Laura Owens and Mary Ann Beckman. Otis–Wilborn testified at the administrative due process hearing and plaintiff acknowledges that her expert report does not rely on new information that was unavailable before the hearing. Plaintiff argues that Otis–Wilborn's report will "serve as clarification of [the] opinion" she presented during the hearing because it is possible the administrative law judge "simply did not understand" the testimony and "therefore gave it little credence." Plts.' Br. in Opp'n to Dft.'s Mot. to Strike, dkt. # 26, at 8. This is not an adequate reason for considering the report in this proceeding. Administrative hearing witnesses are not entitled "to repeat or embellish their prior administrative hearing testimony," *id.* at 790. *See also Springer v. Fairfax County School Board*, 134 F.3d 659, 667 (4th Cir. 1998) ("A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scrambled to use the federal court proceeding to patch up holes in their administrative case."). In addition, I will not consider the Owens–Beckman report, which discusses Jordan's transition planning goals. Although it might be useful in another context, it is of no help in resolving the questions at issue in this case. The report's authors acknowledge that they did not review Jordan's Individualized Education Program or speak with anyone other than plaintiff and Jordan before preparing their report. They argue that this approach gives them a "fresh perspective," but I find that it undermines their ability to shed light on the questions raised by plaintiff's summary judgment motion, including whether defendant provided Jordan a free appropriate public education.

In contrast, I will consider the expert report of Antoinette Chambers. I am sympathetic to defendant's argument that

plaintiff should have offered Chambers's report at the administrative due process hearing. However, courts have rejected a flat rule "that would limit expert testimony to the administrative hearing" and Chambers's report is helpful in "illuminating the nature of the controversy," because it is based on a review of relevant materials including the Individualized Education Program documents. *Burlington,* 736 F.2d at 790. However, I will not consider the opinions Chambers sets out in her May 16, 2003 affidavit, which was submitted well after the deadline for disclosing expert reports in this case. Finally, I will consider the expert report of Jordan's neurosurgeon, Bermans Iskandar, because it contains relevant information on developments in Jordan's medical situation since the administrative hearing. *Id.* at 791 (noting desirability of allowing experts to bring court up to date on child's progress following administrative hearing).

### UNDISPUTED FACTS

Plaintiff is the mother of 17–year old Jordan S., a child with disabilities. She and her son reside in the city of Reedsburg, Wisconsin, where Jordan is a student in defendant Reedsburg School District. Jordan has impairments in his hearing and in his speech and language and he has a learning disability. He has been identified as "other health impaired" and is diagnosed with pervasive developmental disorder. Jordan has severe to profound language deficits, severely delayed social skills, short-term memory problems and some coordination difficulties. His expressive language skills are approximately nine years delayed and his receptive language skills are approximately six years delayed. He has difficulty with appropriate social interaction with students his age. Jordan has hydrocephalus and seizure disorder. He has a shunt and has had a number of shunt revision surgeries. His primary language is sign language.

Defendant school district receives federal funds and operates under Wisconsin law. During part of the 2001–02 school year and all of the 2002–03 school years, Jordan was eligible for and received special education services from defendant, pursuant to the federal Individuals with Disabilities Education Act and Chapter 115 of the Wisconsin Statutes.

Jordan is capable of making significant gains in language development. He has only four years left in his education, so it is critical that he be given the tools he needs to make these significant gains. A deaf child learns language visually through exposure to sign language, through "meaning-making" and "meaning-sharing" experiences with users of that language, be they adults, parents, other deaf and hearing impaired children or teachers of the deaf and hearing impaired. Jordan is eager for contact with people who sign. He gravitates toward anyone who can sign in any given situation. Jordan's treating therapist, Jill Ellinwood, identified a need for Jordan to have opportunities to talk to people in his primary language and indicated that he benefits psychologically when he communicates with others who are deaf. As opposed to direct communication in sign language, instructing a deaf child through an interpreter can pose problems because the quality of the communication and instruction is compromised. The child's understanding of what is being communicated is limited to his level of English functioning, because the interpreter must take information presented in English and change it into sign language. In the past, Jordan has become frustrated in situations where he is not able to communicate his thoughts clearly because others do not sign.

Defendant does not maintain a hearing impaired program. Defendant has never provided special education services to Jordan in Reedsburg, except for periods when Jordan received homebound services. Presently, defendant has only one other deaf student, who is very young. Defendant has asked the state Cooperative Educational Services Agency–5 about obtaining the services of a teacher of the hearing impaired and educational interpreters in Reedsburg. However, the agency informed defendant that it could not provide such services in Reedsburg and that it has for some time been unable to recruit and hire a sufficient number of teachers of the hearing impaired and educational interpreters. The agency has noted a shortage of teachers of the hearing impaired and educational interpreters in Wisconsin and has expressed its concern to the Wisconsin Department of Public Instruction. According to Cooperative Educational Services Agency–5, teachers of the hearing impaired are even less likely to apply for a position in Reedsburg than with a Cooperative Educational Services Agency because of the lack of job security when working with only one student.

When Jordan began receiving special education services at the age of three, defendant placed him in a specialized early childhood program for hearing impaired and non-hearing impaired students in the Madison Metropolitan School District that was taught by a teacher of the hearing impaired. Throughout Jordan's placement in that program from 1989–96, he commuted to Madison approximately 75 minutes each way four days each week. From 1997 until June 2001, Jordan was placed in the hearing impaired program in the Portage School District.

In 1997, the Portage placement was in a self-contained classroom with four deaf students, including Jordan, and a full-time teacher of the hearing impaired. By August 2001, the program had changed to a resource room. Jordan's academic progress has been slower than his deaf classmates, who have made the transition to fully mainstreamed programming. In May 2001, a meeting was held to discuss Jordan's Individualized Education Program, or IEP, as it is known. The IEP team determined that Jordan's placement in Portage would continue. In July 2001, the Sauk County Department of Human Services placed Jordan in a foster home in Mauston, where Jordan attended the Mauston High School from August through December 2001. His placement was in a classroom for cognitively disabled students with the support of an itinerant teacher of the hearing impaired, who worked with Jordan three times each week for an hour and a half. There were no other children in Jordan's classroom in Mauston who used sign language. Jordan's classroom teacher in Mauston believed that Jordan should have been placed in a different classroom for cognitively disabled students functioning at a higher academic level than those in Jordan's room and integrated into some regular high school classes that taught cooking and vocational skills. In December 2001, Jordan moved back to Reedsburg and re-enrolled in the defendant school district.

On January 7 and 17, 2002, defendant held IEP team meetings to develop an individualized education plan for Jordan and to determine his placement upon his return to Reedsburg. Jordan, his parents and his social worker participated in both of the IEP meetings. Other IEP team participants included a district representative, a school nurse, an interpreter, Jordan's teacher of the hearing impaired who is employed by the Cooperative Educational Services Agency–5, a special education teacher and speech and language therapist from the Mauston School District (January 7 meeting only), a representative from the

Wisconsin School for the Deaf (January 17 meeting only) and a representative from Lutheran Social Services that worked with Jordan's family (January 17 meeting only). The district representative investigated several possible placement options for Jordan that the team discussed at the January meetings. Appropriate placement was not available for Jordan in the hearing impaired programs at Portage, Madison, La Crosse, Mauston, River Valley, Tri-County and Spring Green. A representative from La Crosse said it could not provide a placement. The Mauston program said that it would not offer a placement and could not meet Jordan's needs. Madison could meet Jordan's needs, but it had no openings and could not add staff to make a placement available. Spring Green had a teacher of the hearing impaired but could not provide a placement. Portage indicated that it had no room in its cognitively disabled classroom and one staff member was going on maternity leave so there was not full staffing capacity in its deaf and hard of hearing program. A representative from the Wisconsin School for the Deaf informed defendant it could serve Jordan effectively, but that the school did not serve part-time day students.

Jordan's social worker proposed that defendant place him in a Reedsburg school with 10 hours of services a week. Defendant objected to the proposal on the grounds that it would not meet Jordan's educational needs or provide him a free appropriate public education. Instead, defendant proposed a residential placement for Jordan at the Wisconsin School for the Deaf. The school's representative at the IEP meeting stated that it could provide an appropriate placement for Jordan that would meet his education plan's goals and objectives, although the representative did not provide details about specific programs for Jordan. However, Jill Ellinwood, Jordan's treating therapist, had written to

defendant on January 14, 2002, to express her concern about placing Jordan at the Wisconsin School for the Deaf because she believed such a placement would be emotionally detrimental to him. Plaintiff objected to the placement. Over the years, she has expressed the belief that a residential school such as the Wisconsin School for the Deaf is a "deaf cult" that takes children from their parents. The meeting did not result in an agreement regarding either services or placement for Jordan. Plaintiff asked for another meeting so that Ellinwood could attend. Defendant agreed to convene one.

After the parties reached an impasse as to Jordan's placement at the January 17, 2002 IEP meeting, defendant's representatives determined that unless there was new information, defendant had no choice but to offer Jordan a placement at the Wisconsin School for the Deaf, despite the failure of all the members of the IEP team to agree on such a placement. On January 25, 2002, defendant wrote two letters to plaintiff. The Director of Pupil Services described the placement options that the IEP team had explored and noted plaintiff's consistent objection to a placement at the School for the Deaf. Enclosed with the letter was defendant's offer of a placement at the Wisconsin School for the Deaf. Defendant's representative on the IEP team wrote plaintiff to say that defendant believed it had discussed all the information relating to Jordan's placement and program, but that it would be willing to schedule another IEP team meeting if plaintiff informed it in writing of any new, relevant information. Defendant did not receive any new information from plaintiff that it believed would warrant holding another IEP meeting.

At the January 7 IEP meeting, defendant agreed to have Marsha Spees provide one hour each week of direct instruction to

Jordan, beginning on January 11, 2002, while his individualized education plan and placement were being developed. Spees has been a teacher of the hearing impaired since 1973 and is a program support teacher with the state Cooperative Educational Services Agency–5. She has a bachelor's degree in the education of the deaf and a master's degree in educational administration and supervision, with an emphasis on programs for the deaf and hard of hearing. After plaintiff refused the January 25 placement offer at the Wisconsin School for the Deaf, defendant continued to have Spees provide one hour each week of direct instruction to Jordan. Defendant contacted the state Cooperative Educational Services Agency, which advised it that the agency did not have a teacher of the hearing impaired available at that time to provide additional services to Jordan. Spees's services continued through June 22, 2002, and did not amount to an implementation of the May 2001 individualized education plan.

Back on November 28, 2001, plaintiff had provided written consent for the Mauston School District to conduct tests to evaluate Jordan's signing and communication skills, alternative and augmentative communication needs and adaptive behavior. The Mauston staff members who had been expected to complete the evaluations did not do so because Jordan left the Mauston district in December 2001. Defendant selected Marsha Spees to evaluate Jordan's communication needs and skills. Spees is an expert in assistive technology with more than 20 years experience with alternative and augmentative communication systems and devices. She completed a communication assessment report dated March 25, 2002, although the consent form provided to plaintiff had indicated that the tests would be performed by other individuals. Spees conducted trials with functional written communication and low tech assistive communication devices for Jordan

during the evaluation. In her report, she describes Jordan's communication needs and discusses his use of low-tech assistive technology such as keyboards and palm devices. Spees does not recommend a specific augmentative communication device for Jordan. Jordan's individualized education plan states that he "will practice basic techniques of using written words or a typing communication device to communicate with non-signing individuals when an interpreter is not available" and that he "will try various communication devices to evaluate the efficiency of using a word processing device for written communication with individuals who do not sign but can read and write." The Portage speech and language program is continuing with some trials of different devices that might be appropriate for Jordan in the classroom.

Defendant contracted with Sue Deming to evaluate Jordan's sign language skills and needs. Deming is a speech and language therapist at the Madison Metropolitan School District, who is fluent in sign language and has worked extensively with deaf and hearing impaired students, as well as with students who have other disabilities, including pervasive developmental disorder. Deming worked with Jordan from kindergarten through third grade as his speech and language therapist. As part of her evaluation, Deming met with Jordan on February 8, 2002. She completed a written report and provided copies to plaintiff and the members of the IEP team.

Defendant scheduled an IEP team meeting on April 4, 2002, to discuss Spees's and Deming's evaluation reports. Defendant expected that team members would discuss appropriate communication devices for Jordan. At the meeting, the IEP team, including the attorneys for both parties, began discussing Jordan's communi-

cation and language evaluations, but never completed the discussion because plaintiff asked the team to focus instead on the dispute regarding Jordan's placement. There were no revisions to Jordan's then-existing individualized education plan upon the completion of Spees's and Deming's evaluations.

About three weeks earlier, Jordan had been admitted to the University of Wisconsin hospital for shunt revision surgery. Following the surgery, Jordan developed an infection that required removal and replacement of his shunt after the infection was treated and kept him hospitalized for almost a month. Fifteen minutes before the April 4 IEP meeting convened, Dr. Bermans Iskandar, Jordan's neurosurgeon, faxed a letter to defendant's director of pupil services, in which he noted that complications with Jordan's shunt were often subtle and could be fatal without early intervention. He "strongly advise[d] that Jordan continue to live with his parents so they can help manage his daily concerns, and detect shunt problems early on."

Given Jordan's hospitalization and need to recover after his discharge, the IEP team determined at the April 4 meeting that it was not feasible for Jordan to begin a program at the Wisconsin School for the Deaf during the 2001–02 school year. Defendant did not provide an alternate placement notice for the remainder of the school year. Jordan did not receive any educational services from defendant during the summer of 2002.

After a meeting in May 2002 between Dr. Iskandar and defendant's attorney, another IEP meeting was held on May 20, 2002, to consider new medical information. Also, before the May 20 IEP meeting, the Portage program determined that it could provide some services to Jordan during the 2002–03 school year, although not to the extent needed to comply with Jordan's individualized education plan in all re-spects. During the May 20 meeting, defendant reconsidered Jordan's residential placement at the Wisconsin School for the Deaf on the basis of plaintiff's medical concerns and the information provided by Dr. Iskandar. Defendant then discussed its placement offer for Jordan, which involves three days each week at the Portage High School and two days each week at the Wisconsin School for the Deaf on a commuter basis. At Portage, Jordan would receive instruction in a functional life skills curriculum that would include transition programming. He would be located in the cognitive disabilities classroom in the morning, where he would be taught by a cognitive disabilities teacher with an educational interpreter. A teacher of the hearing impaired would provide Jordan two hours of direct instruction in the afternoon. At the Wisconsin School for the Deaf, Jordan would be placed in the regular high school in small academic and transition courses with similarly disabled students for approximately four hours a day. Plaintiff refused this offer.

The commute to Portage is approximately 50 minutes each way from plaintiff's house in Reedsburg and 65 minutes each way from Jordan's father's house in Loganville. The commute to the Wisconsin School for the Deaf is approximately 2 hours and 10 minutes each way in good weather. Lucinda Yanke, a nurse employed by defendant, is responsible for the medical component of a safety plan relating to Jordan's commute to school. Defendant plans to take the same precautions for Jordan that it has taken since he started commuting to school more than 10 years ago. Yanke has prepared a color-coded map for Jordan's driver showing the location of the nearest hospitals along the route to the Wisconsin School for the Deaf in Delevan. Delevan is 18 minutes from Madison via Med Flight, as compared to a 16 minute flight from Reedsburg. Jordan commutes to school in a car with a driver

trained by Yanke on proper response to seizures, using training reviewed by plaintiff. The driver is equipped with a cell phone and a copy of Jordan's current medical protocol. Beginning in 1989, using the same protocol, Jordan has commuted safely to school for the past 13 years. Jordan first commuted from Loganville to the Madison program in 1989 at age three. From 1992 through 1997, Jordan traveled one hour and 15 minutes each way from Loganville to Madison. From 1997 until April 2001, Jordan traveled 65 minutes each way between Loganville and Portage. Throughout the past ten years, no medical professional has advised defendant that it is not safe for Jordan to commute to any of these schools. However, none of these commutes lasts as long as the proposed commute to the Wisconsin School for the Deaf.

The risk of undetected shunt failure can be reduced by creating and distributing a protocol that includes shunt malfunction symptom information. It is common for the family and school to provide such information to the personnel at a child's school. School personnel at the Wisconsin School for the Deaf could be instructed to transport Jordan to Madison at the first sign of a shunt malfunction. Jordan has no history of rapid onset of shunt malfunction. Dr. Iskandar has never advised Jordan's family that they should move closer to Madison as he has with other patients who tend to deteriorate quickly.

Defendant's proposed placement at the Wisconsin School for the Deaf does not increase the amount of time Jordan would be away from plaintiff, at least during good weather. At the Portage stay-put placement, Jordan's school day runs from 8:30 a.m. to 3:00 p.m. Under defendant's proposal, Jordan would leave home for the Wisconsin School for the Deaf at the same time he would leave for Portage and he would leave the school in time to arrive home at the same time he would from his Portage placement. This would necessarily reduce the time for Jordan's educational instruction on the days he attends the Wisconsin School for the Deaf. When Dr. Iskandar was asked at the administrative due process hearing to give his medical opinion about the day placement at the Wisconsin School for the Deaf, he asked why defendant was proposing such a long commute. After the administrative law judge gave Iskandar a brief explanation of defendant's concerns regarding Jordan's educational need to communicate with peers in sign language, Iskandar testified that he looked at the question of Jordan's educational program as a risk/benefit analysis. His analysis was that Jordan was a developmentally disabled child who was unlikely to work in the future and therefore he questioned the benefit to Jordan of the additional educational opportunity. Iskandar went on to say that if Jordan were a child of significant intellectual potential, it might be worth the additional risk. Iskandar continues to maintain that "it has been difficult for [him] to conceive of any educational benefit that might outweigh the need for Jordan to be in close proximity to his main care-giver, his mother."

At the due process hearing, Jill Ellinwood testified that she does not have the same level of concern about the current day placement at the Wisconsin School for the Deaf as she did about the earlier residential placement offer. Nevertheless, she testified that she thought that attending the Wisconsin School for the Deaf two days a week and Portage three days a week would be stressful for Jordan and cause him to act out. However, Ellinwood has never observed Jordan in a social setting other than in the waiting room at Human Services or at Families Come First meetings. She has not observed Jordan at any school and has never accompanied Jordan to a new school setting. Ellinwood testified that she was unaware that there

were no other children who sign in Jordan's classroom and that Jordan has no opportunity to converse with the two other deaf students at Portage High School. Upon learning of this situation at the due process hearing, Ellinwood testified that the lack of such opportunities in Jordan's daily school setting concerned her and she testified that one answer to this dilemma would be to have him attend the Wisconsin School for the Deaf. She thought, however, that there might be other solutions. When told that there are no placements within a large radius where there are students who sign other than the Wisconsin School for the Deaf, Ellinwood testified that she could not answer the question whether that information changed her opinion about Jordan attending the Wisconsin School for the Deaf as a day student.

The parties agreed upon a stay-put placement pending the resolution of the due process hearing and the appeal to the court. (The parties dispute whether the stay-put placement should remain in effect if this court's decision is appealed.) The stay-put placement is at the Portage High School in the deaf and hard of hearing program. Jordan has classes in functional life skills in the cognitively disabled classroom in the morning, using a curriculum designed jointly by his hearing impaired teacher and the cognitive disabilities teacher. In the afternoon, Jordan works with the teacher of the hearing impaired on reading, writing and functional math, as well as on social and vocational skills. Despite Jordan's current stay-put placement in the cognitively disabled classroom, he has not been identified as cognitively disabled. There is one other deaf student in Jordan's cognitively disabled classroom, but his sign language vocabulary is 10 words or fewer. There are two other deaf students in the Portage High School program that are fully mainstreamed in the ninth grade level. They do not have the same academic schedule or lunch time as Jordan. They do not share Jordan's interests or get along with him well. It is unlikely that Jordan would experience any benefit if a deaf student who did not get along with him were required to eat lunch with him. Interaction with students who have much higher functioning and much higher English and communication skills than Jordan is not the type of social interaction that would allow Jordan to develop his social skills. To do that, Jordan needs opportunities to talk to fellow students in class and at lunch about common experiences and situations. To the extent Jordan communicates in sign language outside of his educational placement, the lack of such communication in the educational setting is frustrating. Jordan's current stay-put placement in Portage is not adequate to address his academic development or transition needs.

The Wisconsin School for the Deaf has students of similar age and functioning level as Jordan. Jordan would have more normal social interactions at the Wisconsin School for the Deaf and would be able to make friends. The school would offer academic study courses such as biology, daily living skills, record keeping and social skills, consumer math, history, and work-study, as well as social opportunities at lunch and pre-vocational experiences. Nancy Keith is a teacher of the hearing impaired with Cooperative Educational Services Agency–5. She has known Jordan for six years. Currently she provides two hours of direct instruction to Jordan each day at Portage High School and serves three other school districts on an itinerant basis. In the past she has provided direct instruction to Jordan in his home. Keith has a bachelor's degree in child psychology and deaf studies and a master's degree in deaf education. Keith has observed that Jordan has adapted quickly and well to multiple environments through multiple transitions. She believes that two days of programming at the Wis-

consin School for the Deaf is essential because Jordan needs to be taught in his primary language and to have friends who can communicate with him directly.

Defendant has discussed with the Wisconsin School for the Deaf potential avenues for coordinating Jordan's programs at Portage and the school to provide continuity, including email, a communication book and visits. Rene Ambrose, a teacher at the Wisconsin School for the Deaf, has a student who divides his time between her school and the Wisconsin School for the Blind and she has not had any problems coordinating his programming between the two schools.

Plaintiff's expert, Dr. Otis–Wilborn, expressed concerns at the due process hearing that Jordan's programming not be limited to students who are below his functioning level. The drafters of Jordan's individualized educational plan wrote that, for a variety of reasons, "participation in the general curriculum with non-handicapped peers is considered to have a harmful effect on the quality of educational services which can be provided to meet Jordan's needs." They added that his program should have daily life applications rather than traditional academic goals. For the past several years, Jordan's plan has called for development of functional life skills. Otis–Wilborn agreed that Jordan's focus should be on functional aspects of reading, writing and math. Otis–Wilborn has not observed the Wisconsin School for the Deaf program that defendant proposed for Jordan.

During fall 2002, Jordan's school hours were shifted because plaintiff was concerned that a regular length school day was too tiring. A normal Portage school day runs from 8 a.m. to 3:15 p.m. Originally, Jordan started school in September 2002 at 8:00 a.m. and had an interpreter with him beginning at that time. Plaintiff asked that Jordan start at 9:00 a.m. be-cause he was very tired when he got home from school, so both Jordan and the interpreter started at 9:00 a.m. Later, plaintiff requested that Jordan's starting time be changed to 8:30 a.m., because his teacher had noted that Jordan was missing her review of the day's schedule, which he enjoyed. By that time, the interpreter was then assigned elsewhere and a gap developed in interpreter coverage from 8:30 a.m. to 9:30 a.m. As soon as defendant was informed of the gap, it requested that Cooperative Educational Services Agency–5 cover the gap.

In August 2002, Spees contacted Judy Cumley of the Wisconsin Assistive Technology Initiative about using its formal assistive technology process. Cumley knows more than Spees about assistive technology devices although she does not have a high level of knowledge regarding signing and deaf children. Cumley told Spees that an assistive technology evaluation must be a team effort with participation from both Jordan's family and his school. Spees told Cumley that she wanted the team to meet as soon as possible. Spees identified October 28, 2002, as the first available date that Cumley, school staff and plaintiff could attend such a meeting. The date was arranged through plaintiff's attorney. However, the meeting could not be conducted as planned because plaintiff made a scheduling error. After the due process hearing was concluded, but before the administrative law judge rendered her decision, defendant convened an assistive technology team on November 25, 2002, to recommend assistive technology that could help provide support to Jordan in obtaining a free appropriate public education in the least restrictive environment.

In a letter to the Wisconsin Department of Public Instruction dated September 20, 2002, plaintiff requested an administrative due process hearing pursuant to 20 U.S.C.

§ 1415(f), alleging that defendant had failed to provide Jordan with a free appropriate public education in the least restrictive environment. The letter set forth three numbered sections identifying the specific violations of the IDEA that defendant allegedly committed. An administrative due process hearing was held on November 4–7, 2002. An administrative law judge issued a decision on December 11, 2002, concluding that:

1. Defendant's placement offer for the 2002–03 school year provides Jordan with a free appropriate public education in the least restrictive environment;

2. Defendant properly evaluated Jordan's communication needs and his 2002–03 individualized education program provides a free appropriate public education with regard to his communication needs;

3. From January to June 2002, defendant offered Jordan a free appropriate public education through an appropriate individualized education program and placement that his parent rejected. Therefore, Jordan is not entitled to compensatory education; and

4. Jordan's placement for the remainder of the 2002–03 school year will be the placement offered by defendant on May 20, 2002.

After the due process hearing, Jordan was hospitalized again for a surgical shunt revision. As in the past, it was plaintiff that first determined that Jordan was having problems with his shunt, even in the absence of corroborating radiographic evidence.

## MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review for IDEA Claims

The standard of review of administrative agency decisions under the IDEA is provided by 20 U.S.C. § 1415(i)(2)(B):

In any action [challenging an administrative decision], the court–

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

As this provision indicates, the IDEA "authorizes the district court to receive and consider new evidence, that is, evidence that was not before the administrative law judge, and to reverse his decision if it is contrary to the 'preponderance of the evidence.'" School District of Wisconsin Dells v. Z.S. ex rel. Littlegeorge, 295 F.3d 671, 675 (7th Cir.2002). Therefore,

a reviewing court that has before it evidence not considered at the administrative level will naturally defer less to the administrative decision, as it has an information advantage over the administrator that it lacks when judicial review is limited to the record that was before him. Judicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have.

Id. The level of deference to the administrative decision is thus a "sliding scale" based on the amount and significance of new evidence received by the district court. Id. Even where the district court receives some evidence that was not before the administrative law judge, if the new evidence is minimally significant, the district judge must be "strongly convinced that the [administrative law judge's] order is erroneous" and must give "considerable deference to the reviewing officer." Id. This makes particular sense in Wisconsin, where administrative law judges who hear IDEA cases are specialists, id. at 676 (cit-

ing Wis. Admin. Code § PI 11.12(2)), in contrast to courts, which "lack special expertise in the area of educational policy" and therefore should "give 'due weight' to the results of the administrative decision." *Todd v. Duneland School Corp.,* 299 F.3d 899, 904 (7th Cir.2002). Although I have agreed to consider two expert reports offered by plaintiff that were not before the administrative law judge, I will still give considerable deference to the administrative law judge's decision. As will become clear, the additional evidence submitted by plaintiff is not particularly significant when considered alongside the evidence that was produced by the parties at the due process hearing. Finally, I note that as the party challenging the outcome of the state administrative hearing, plaintiff bears the burden of proof. *See Board of Education of Murphysboro v. Illinois State Board of Education,* 41 F.3d 1162, 1167 (7th Cir. 1994).

### B. *IDEA Statutory Framework*

The Individuals with Disabilities Education Act (formerly the "Education of the Handicapped Act") was passed in 1975 in response to Congress's perception that handicapped children in the United States were being excluded from educational opportunities. *Board of Education of Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (discussing legislative history of the act). The goal of the IDEA is to insure a free appropriate public education for all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "Under IDEA, a [free appropriate public education] is an educational program 'specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *Board of Education of La Grange School District v. Illinois State Board of Education,* 184 F.3d 912, 915 (7th Cir.1999)

(quoting *Murphysboro,* 41 F.3d at 1166). The act attempts to achieve this goal by conditioning federal funding on state compliance with a variety of substantive and procedural obligations. 20 U.S.C. § 1412 (establishing eligibility requirements for states to qualify for assistance under IDEA).

The IDEA requires identification and evaluation of children with disabilities that require special services as a result of their disabilities. Once a child has been identified as a child with a disability under the act, the act requires the state to assemble a team to evaluate the child and develop an Individualized Education Program tailored to the unique needs of the child. 20 U.S.C. §§ 1401(11), 1414(d). This individualized education plan sets forth the child's educational level, performance and goals and is the governing document for all educational decisions concerning the child. *See Board of Education, No. 218, Cook County v. Illinois State Board of Education,* 103 F.3d 545, 546 (7th Cir.1996). The school district must determine the child's category of eligibility in accordance with both federal and state regulations. 34 C.F.R. § 300.7; Wis. Admin. Code ch. PI 11.

The Supreme Court has held that a court's inquiry in suits brought under the IDEA is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. This inquiry includes determining whether the state has created an individualized education plan that conforms with the requirements of the act. *Id.* at 207 n. 27, 102 S.Ct. 3034. "Once the school district has met these two requirements, the courts cannot require more;

the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro,* 41 F.3d at 1166.

### C. *Review of Administrative Law Judge's Decision*

Plaintiff argues that the administrative law judge erred in concluding that defendant complied with the IDEA's procedural requirements. In plaintiff's view, defendant failed to complete a proper evaluation of Jordan's communication needs and convened IEP meetings that were inadequate. Plaintiff also contends that defendant's proposed placements for Jordan at the Wisconsin School for the Deaf failed to comply with the statute's requirement that he be educated in the least restrictive environment. In addition, plaintiff argues that defendant's proposed placements fail to take account of Jordan's needs relating to his eventual transition from school to post-school activities. According to plaintiff, these various inadequacies entitle them to compensatory education for Jordan.

#### 1. *Procedural requirements*

■ Defendant is required to (1) comply with the IDEA's administrative procedures in (2) developing an individualized education plan that is reasonably calculated to enable Jordan to receive educational benefits. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1054 (7th Cir.1997). " 'Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity ... clearly result in the denial of' " such an education. *Heather S.,* 125 F.3d at 1059 (quoting *W.G. v. Board of Trustees,* 960 F.2d 1479, 1484 (9th Cir.1992)).

#### a. Communication evaluation

■ Plaintiff maintains that defendant failed to conduct "a full spectrum communication evaluation" on Jordan. As defendant points out, plaintiff cites no proposed finding of fact in support of this contention and does not define a "full spectrum evaluation." Indeed, plaintiff's position on the issue of a communication evaluation is somewhat muddled. Plaintiff objects to defendant's alleged failure to perform an adequate evaluation while simultaneously suggesting that she would not have consented to such an evaluation at the hands of defendant's experts, Marsha Spees and Sue Deming. *See* Plts.' Proposed Findings of Fact, dkt. # 17, at ¶¶ 11–13. In any case, I understand plaintiff's main contention to be that defendant did not evaluate Jordan's need for "assistive technology and communication development beyond sign language." *Id.* at ¶ 13. The IDEA provides that an IEP team must "[c]onsider whether the child requires assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v); 34 C.F.R. § 300.346(a)(2)(v).

The administrative law judge concluded that defendant had adequately considered Jordan's assistive technology needs. *See In the Matter of [Jordan S.] v. Reedsburg School District,* LEA–02–051, slip op. at 8–9 (Dec. 11, 2002). She noted that the "IEP developed for [Jordan] on January 7 and 17, 2002, contains a description of [his] assistive technology needs and particular devices and services he needs." According to the plan, Jordan

> requires availability of captioning for videos or voiced television programs, as well as instruction in the use of a TTY and/or e-mail for remote communication capabilities. Jordan has recently been experimenting with the use of a handheld communication device which allows him to type in words or phrases

and has speech capabilities (such as Litewriter by Zygo.) Utilization of such a device would allow Jordan to have limited direct communication with those who do not sign but can read and write. Record, dkt. # 14, ex. 7, at 3. The plan notes that Jordan "will practice basic techniques of using written words or a typing communication device to communicate with non-signing individuals when an interpreter is not available" and that he "will try various communication devices to evaluate the efficiency of using a word processing device for written communication with individuals who do not sign but can read and write." *Id.* at 6, 10. It is undisputed that Marsha Spees is an expert in assistive technology with more than 20 years' experience with alternative and augmentative communication systems and devices and that she assessed Jordan's communication abilities and needs in a report dated March 25, 2002 and conducted trials with functional written communication and low tech assistive communication devices for Jordan during the evaluation. She discusses in her report Jordan's use of low-tech assistive technology such as keyboards and palm devices. Record, dkt. # 14, ex. 13, at 4.

Moreover, as the administrative law judge noted and the undisputed facts reveal, at the April 4, 2002 meeting scheduled by defendant to discuss Spees's report, the IEP team began discussing Jordan's communication and language evaluations, but plaintiff cut the discussion short, by asking the team to focus instead on the dispute regarding Jordan's placement. Finally, it appears from the undisputed facts that defendant continued its efforts to insure that Jordan is receiving the benefit of appropriate assistive technology throughout 2002, with the assistance of the Wisconsin Assistive Technology Initiative. Although plaintiff asserts that none of the devices identified by the IEP team with the help of the Wisconsin Assistive Technology Initiative have "been consistently provided by [defendant] to Jordan in a manner that conforms to sound assistive technology practice," she points to no competent evidence to support this assertion.

Given these facts, it is difficult to disagree with the administrative law judge's conclusion that defendant evaluated Jordan's communication and assistive technology needs adequately. Plaintiff's real objection to Spees's report appears to be with its conclusion that Jordan's severe language and learning disabilities militate in favor of his receiving his educational instruction in his native sign language to the maximum extent possible, rather than relying more heavily on assistive technology. *Id.* at 5; *see also In the Matter of [Jordan S.],* slip op. at 8 (noting that Jordan's "primary language is sign language, and it is unreasonable for [plaintiff] to expect that a language and communication evaluation will not contain a great deal of information about [Jordan's] skills and needs in his primary language"). Although plaintiff may disagree with the determination that Jordan's educational needs require a heavy emphasis on sign language, she has failed to carry her burden of demonstrating that the administrative law judge erred in concluding that defendant complied with the IDEA's procedural requirement to "consider whether [Jordan] requires assistive technology devices and services." 34 C.F.R. § 300.346(a)(2)(v).

In an effort to carry this burden, plaintiff relies primarily on the expert report of Antoinette Chambers, which, as explained earlier, was not submitted to the administrative law judge. Chambers is an expert on assistive technology. The first portion of Chambers's report is unhelpful. It lists several "quality indicators" to be used in assessing assistive technology needs devel-

oped by a grassroots consortium of educators. After most of these indicators, the report states simply "Not So For Jordan." However, Chambers makes no effort to explain why a given indicator was not satisfied by Jordan's individualized education plan or Spees's communication evaluation. For instance, the second indicator requires that the "IEP team has the knowledge and skills to make informed assistive technology decisions." Chambers's Report, dkt. # 9, at 8. Chambers indicates that this condition was not met in Jordan's case, even though it is undisputed that Marsha Spees is an expert in assistive technology with a vast amount of experience in the field. *See also id.* at 9 (indicating erroneously that no one on Jordan's IEP team was knowledgeable regarding assistive technology).

Chambers's report is more instructive in the second part, in which she discusses Jordan's individualized education plan. She notes that although "the use of assistive technology is documented within Jordan's IEP," the assessment of his assistive technology needs was "haphazard" and lacked structure. She believes that had "a basic structure for consideration of [assistive technology] been followed for Jordan, he may have engaged in more meaningful, engaging learning opportunities to reach his educational goals and objectives." *Id.* at 18. Although Chambers may be correct that defendant's evaluation of Jordan's assistive technology needs did not live up to "best practice," her report does not convince me that defendant failed to comply with the IDEA's basic procedural requirements or deprived Jordan of an individualized education plan calculated to provide him educational benefits. Accordingly, I conclude that the administrative law judge did not err in finding that defendant properly evaluated Jordan's communication needs and that his 2002–03 individualized education plan is reasonably calculated to

provide a free appropriate public education related to those needs.

### b. *IEP meetings*

■ The IDEA provides "an opportunity for the parents of a child with a disability ... to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1); *see also* 20 U.S.C. § 1414(d)(1)(B)(i) (defining IEP team to include parents of child with disability); 34 C.F.R. § 300.552. Plaintiff contends that defendant violated the IDEA's procedural requirements because the IEP team members, including plaintiff, never reached a consensus as to the appropriate placement for Jordan. However, like the administrative law judge, I conclude that this claim is without substance. *See In the Matter of [Jordan S.],* slip op. at 9 ("The record refutes [plaintiff's] argument that [defendant] unilaterally determined [Jordan's] placement and violated [plaintiff's] procedural rights by not holding another IEP team meeting.").

It is undisputed that plaintiff participated in IEP team meetings on January 7 and 17, 2002, at which the availability and merits of a variety of placements for Jordan were debated, including the residential placement at the Wisconsin School for the Deaf that defendant ultimately offered. Plaintiff objects to the fact that defendant opted not to reconvene the IEP team for a third time in January so Jordan's therapist could participate. However, it is undisputed that the IEP team considered the therapist's objections to Jordan's proposed placement at the Wisconsin School for the Deaf, which she had communicated to the team in a January 14, 2002 letter. The failure to reconvene a third meeting before

issuing a placement offer did not violate the IDEA's procedural requirements.

Further, it is undisputed that plaintiff participated in a subsequent IEP team meeting on April 4, 2002, during which Jordan's placement was discussed and in a May 20, 2002 IEP team meeting that led to a revised placement offer for Jordan in response to new evidence from Jordan's doctor regarding health concerns raised by defendant's offer for a residential placement at the Wisconsin School for the Deaf. I agree with defendant that plaintiff's argument boils down to an assertion that a parent must agree to a proposed placement decision to avoid a violation of the IDEA's procedural requirements, regardless of the extent of the parent's participation in IEP meetings. The statute's procedural protections do not sweep that broadly. *See Blackmon v. Springfield R–XII School District,* 198 F.3d 648, 657–58 (8th Cir.1999) (noting that IDEA "does not require school districts simply to accede to parents' demands without considering any suitable alternatives" and that failure to agree on placement does not constitute a procedural violation of IDEA); *Yates v. Charles County Board of Education,* 212 F.Supp.2d 470, 472 (D.Md.2002) ("[P]arents who seek public funding for their child's special education possess no automatic veto over a school board's decision"); *Rouse v. Wilson,* 675 F.Supp. 1012 (W.D.Va.1987); 34 C.F.R. Pt. 300 App. A, at 105 ("The IEP team should work toward consensus, but the public agency has ultimate responsibility to ensure that the IEP includes the services that the child needs in order to receive [a free appropriate public education]."). I conclude that plaintiff participated sufficiently in the development of Jordan's individualized education plan to satisfy the IDEA's procedural requirements.

#### c. *Transition services*

Beginning at age 16, a child's individualized education plan must include a statement of needed transition services. 20 U.S.C. § 1414(d)(1)(A)(vii)(II). Transition services are based on a student's needs and interests and "promote[ ] movement from school to post-school activities, including ... vocational training, integrated employment ... continuing and adult education, adult services, independent living or community participation." They may include "instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation." 20 U.S.C. § 1401(30). Plaintiff does not argue that Jordan's individualized education plan fails to discuss his transition needs or that defendant's proposed placement does not provide any transition services. Indeed, it is undisputed that Jordan will receive transition programming at both Portage High School and the Wisconsin School for the Deaf, including training in functional life and daily living skills. Plaintiff argues instead that defendant's proposed placement of Jordan does not provide appropriate transition services because neither school is located in Reedsburg, the community where Jordan is likely to live as an adult. As defendant notes, plaintiff proposed no findings of fact regarding this issue and her reliance on the Owens–Beckman report is misplaced, because, as discussed earlier, I am not considering it. Plaintiff offers little else in the way of support for her argument that Jordan's transitional services needs can be met only in Reedsburg. After reviewing the record, I agree with the administrative law judge's conclusion that Jordan's "transition needs can be met in places other than Reedsburg School District, but the evidence shows that his direct instruction and direct com-

munication needs in his primary language can not be provided for" in Reedsburg. *In the Matter of [Jordan S.]*, slip op. at 7.

### 2. *Least restrictive environment*

The IDEA creates a strong preference in favor of mainstreaming handicapped children by educating them in the "least restrictive environment." That is, states must insure that to

> the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see also La Grange*, 184 F.3d at 915. The federal regulations implementing the IDEA require that an educational placement be as close as possible to the child's home and, to the extent that the child's disability does not require some other arrangement, that the child be educated in the school he or she would attend if not disabled. *See* 34 C.F.R. § 300.552. However, these provisions must be considered in conjunction with federal regulations applicable to deaf or hearing impaired children, which require the IEP team to "consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode." 34 C.F.R. § 300.346(a)(2)(iv).

In her initial summary judgment brief, plaintiff devotes less than two pages to her argument that defendant's January and May 2002 placement offers do not satisfy the IDEA's least restrictive environment requirement "because of the distance of the commute and Jordan's unique medical needs." Plts.' Br. in Supp. of their Mot. for Summ. J., dkt. # 16, at 25–26. This discussion is inadequate in light of the fact that plaintiff bears the burden of proving that the administrative law judge erred in concluding that both the January and May 2002 placement offers provided Jordan with a free appropriate public education in the least restrictive environment. Plaintiff's argument relates only to those portions of the placement offers requiring Jordan to reside at the Wisconsin School for the Deaf or commute there. Plaintiff raises other issues for the first time in her reply brief, but I will not consider them. *See Eby–Brown v. Wisconsin Department of Agriculture*, 213 F.Supp.2d 993, 1011 (W.D.Wis.2001) (arguments raised for first time in reply brief are waived).

Plaintiff devotes a paragraph to the assertion that the January 2002 residential placement offer at the Wisconsin School for the Deaf was inappropriate. The argument is insubstantial because plaintiff does not attempt to dispute the administrative law judge's finding that defendant had no reason to know about plaintiff's medical objections to a residential placement at the Wisconsin School for the Deaf when it proposed the placement after the January IEP meetings. It was not until April 2002 that defendant first received a letter from Dr. Iskandar expressing concern about such a placement and not until May 2002 that defendant's lawyer and Iskandar met to discuss Jordan's situation. As the administrative law judge noted,

> [b]ased upon the facts then known to [defendant], which did not include information from Dr. Iskandar, the residential placement offer at [the Wisconsin School for the Deaf] was an appropriate

placement for [Jordan] in the least restrictive environment. It would be inequitable to measure the appropriateness of an IEP and placement offer after-the-fact.

*In the Matter of [Jordan S.],* slip op. at 9.

Plaintiff also maintains that the May 2002 placement offer (covering the 2002–03 school year) is not in the least restrictive environment to the extent that Jordan must travel two hours and ten minutes each way to commute to the Wisconsin School for the Deaf two days each week. Plaintiff argues that the duration of the round trip and Jordan's medical problems make such a commute inappropriate. The administrative law judge concluded that although the commute to the Wisconsin School for the Deaf was not an ideal solution, it was necessary to meet Jordan's educational needs as identified in his individualized education plan, particularly his need to receive instruction and communicate with peers and teachers in his primary language. She found that "the evidence indicates that medical risks to the child will be minimally increased, if at all, by attending" the school two days a week and that "the educational benefits to [Jordan] of attending [the Wisconsin School for the Deaf] two days per week outweigh any medical risks posed by the commute." *Id.* at 6–7. As noted earlier, I have agreed to review the expert report of Dr. Iskandar, which was not available to the administrative law judge, because I believe that the medical issues related to Jordan's shunt are the most critical factors in assessing the propriety of a commute to the Wisconsin School for the Deaf. However, Iskandar's one-page letter does not convince me that the administrative law judge erred in concluding that the 2002–03 placement offer was medically appropriate.

In his letter-report, Iskandar notes that "it has been difficult for me to conceive of any educational benefit that might out-

weigh the need for Jordan to be in close proximity to his main care-giver, his mother" and that "it is important from a medical standpoint to have Jordan close to his mother, not two hours away everyday." This portion of Iskandar's report does little more than repeat his testimony from the due process hearing, which I have reviewed in its entirety. At the hearing, Iskandar noted that Jordan was a developmentally disabled child who was unlikely to work in the future, calling into question the benefit of any additional educational opportunities. Iskandar also testified that if Jordan were a child of significant intellectual potential, the commute might be worth the additional risk. Iskandar's report is problematic for two reasons. First, Iskandar is not an expert with respect to Jordan's educational abilities and potential. Second, the report suggests that Iskandar is not entirely familiar with the proposed placement, which would not require Jordan to commute to the Wisconsin School for the Deaf "everyday," but only two days each week. The difference between commuting two days a week rather than five obviously affects what Iskandar noted was essentially a risk-benefit analysis. *See* Hearing Tr. at 868–71.

Iskandar noted in his letter that since the due process hearing, Jordan had required another shunt revision and that it was plaintiff that had identified the need for the revision, as usual. However, I am unable to conclude that this additional evidence is particularly weighty, given the undisputed fact that defendant's proposed placement does not increase the overall amount of time Jordan would be away from plaintiff on the days he commutes to the Wisconsin School for the Deaf. Along with the undisputed fact that Jordan has no history of rapid onset of shunt malfunction, this blunts the force of plaintiff's argument that she is the only person who has proven capable of detecting a shunt

failure. Finally, Jordan's history of commuting successfully more than an hour each way to the Madison school district and the medical safety plan defendant has developed for Jordan's commute lead me to agree with the administrative law judge that defendant's 2002–03 placement offer is not medically inappropriate for Jordan.

■ Tied up with the question whether defendant's placement offer provides Jordan with an appropriate education in the least restrictive environment is the alternative placement that plaintiff has proposed for Jordan. The least restrictive environment requirement "is relative and concentrates on other placement options" than the one proposed by a school district. *Beth B. v. Van Clay,* 282 F.3d 493, 497 (7th Cir.2002). Unfortunately, plaintiff did not propose any facts about the alternate placement she envisions for Jordan and instead cites largely to a report that was not presented to the administrative law judge and which I have agreed to strike. Nevertheless, I have gleaned the basic outlines of plaintiff's proposal from the administrative law judge's opinion and the hearing record.

Plaintiff proposes that Jordan "be educated two days per week in [defendant] Reedsburg School District, rather than at [the Wisconsin School for the Deaf], in addition to the three days per week at Portage ... [so he could] benefit from vocational and other classes in the Reedsburg High School, as well as vocational experiences in the Reedsburg community." *In the Matter of [Jordan S.],* slip op. at 7. The administrative law judge found that plaintiff had failed to demonstrate how this placement would address the need, identified both in Jordan's individualized education plan and the federal regulations implementing the IDEA, to consider Jordan's language and communication needs and his opportunities for direct communication and instruction with peers and professional personnel in sign language. *See id.;* Record, dkt. # 14, ex. 7, at 3; 34 C.F.R. § 300.346(a)(2)(iv). Plaintiff's proposal does not address the need for Jordan to receive direct instruction in sign language and to engage in signing with peers of similar age and educational level. Sufficient opportunities simply do not exist and cannot be created reasonably in the combined Reedsburg–Portage placement proposed by plaintiff.

Although the least restrictive environment requirement "shows Congress's strong preference in favor of mainstreaming, [it] does not require, or even suggest, doing so when the regular classroom setting provides an unsatisfactory education." *Van Clay,* 282 F.3d at 497 (internal citation omitted); *see also Lachman v. Illinois State Board of Education,* 852 F.2d 290, 295 (7th Cir.1988) ("[I]t is clear that the courts considering this issue have determined that the Act's mainstreaming preference is to be given effect only when it is clear that the education of the particular handicapped child can be achieved satisfactorily in the type of mainstream environment sought by the challengers to the IEP proposed for that child."). Accordingly, I conclude that plaintiff's proposal for Jordan's education is not appropriate under the IDEA and that defendant's proposed placement does not violate the statute's least restrictive environment requirement.

### 3. *Compensatory education*

■ Compensatory education is an equitable remedy available to cure violations of the IDEA. *See Board of Education of Oak Park v. Illinois State Board of Education,* 79 F.3d 654, 656 (7th Cir.1996). However, plaintiff concedes that "if this court upholds the [administrative law judge's] decision in its entirety, then Jordan will not be entitled to an award of compensatory education." Plts.' Reply Br., dkt. # 31, at 22.

Because I have concluded that the administrative law judge did not err in finding that Jordan's individualized education plan and defendant's placement offers for the January through June 2002 semester and the 2002–03 school year comported with the requirements of the IDEA, Jordan is not entitled to compensatory education on the basis of those placement offers.

However, one issue remains that was not addressed by the administrative law judge. During the fall 2002 semester, Jordan's school hours were shifted at plaintiff's request. Originally, Jordan started school in September 2002 at 8:00 a.m. and had an interpreter with him beginning at that time. Plaintiff asked that Jordan start at 9:00 a.m. because he was very tired when he got home from school. Defendant accommodated this request. Then plaintiff asked for another change, to make Jordan's starting time 8:30 a.m. However, because of a scheduling error, defendant did not provide an interpreter for this earlier period. Defendant did not know of the omission until the due process hearing, when it came out in testimony. As soon as it learned of it, it corrected the problem. Plaintiff maintains that Jordan is entitled to an hour of compensatory education for each day he went without an interpreter in the early morning.

■■■ Because plaintiff did not discover this scheduling error until the administrative hearing was underway, her hearing request did not seek relief for the interpreter's absence and the administrative law judge had no cause to rule on the issue. Ordinarily, a plaintiff must exhaust state administrative remedies before seeking relief under the IDEA in federal court, but the exhaustion requirement can be excused where "the pursuit of administrative remedies would be futile or inadequate; waste resources, and work severe or irreparable harm on the litigant; or when the issues raised involve purely legal

questions." *Pihl v. Massachusetts Department of Education,* 9 F.3d 184, 190 (1st Cir.1993); *see also Maine School Administrative District No. 35 v. Mr. and Mrs. R.,* 321 F.3d 9, 18 (1st Cir.2003). Therefore, the failure to exhaust a claim is not always an insurmountable hurdle. However, without a fully developed administrative record on this issue, it would be difficult to resolve this issue. The hearing record does not reveal precisely how long Jordan was without the services of an interpreter for the 8:30 to 9:30 a.m. period and plaintiff has not proposed any facts to fill in the evidentiary gap. Plaintiff does not specify what services an order of compensatory education would involve, when those services would be provided, who would provide them or how they would serve Jordan's particular educational needs. Plaintiff's request is simply too ill-defined and open-ended to allow the court to enter an award of compensatory education for Jordan.

### D. *Termination of Stay–Put Placement*

■■■ The parties dispute whether Jordan's current stay-put placement should extend only through the termination of this proceeding (defendant's position) or through an appeal of this court's decision to the Court of Appeals for the Seventh Circuit (plaintiff's position). Defendant asks the court to terminate the stay-put placement immediately upon issuing this opinion so that there is sufficient time to prepare Jordan's placement for the upcoming school year, which is rapidly approaching. The IDEA provides that "during the pendency of any proceedings ... unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement ... until all such proceedings have been completed." 20 U.S.C. § 1415(j). In *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), the

Supreme Court considered the stay-put provision in the Education of the Handicapped Act, the IDEA's predecessor statute. The Court noted that the Act's legislative history made clear that "one of the evils Congress sought to remedy was the unilateral exclusion of disabled children by *schools*, not courts, and one of the purposes of [the stay-put provision], therefore, was 'to prevent *school* officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings. The stay-put provision in no way purports to limit or pre-empt the authority conferred on courts" by the Act. *Id.* at 327, 108 S.Ct. 592 (internal citations omitted) (emphasis in original). Relying on this discussion, courts have concluded that a district court has the discretion to terminate a stay-put placement without awaiting the outcome of an appeal. "Once a district court has rendered its decision approving a change in placement, that change is no longer the consequence of a unilateral decision by school authorities; the issuance of an automatic injunction perpetuating the prior placement would not serve the [provision's] purpose." *Andersen by Andersen v. District of Columbia*, 877 F.2d 1018, 1024 (D.C.Cir.1989).

I agree with defendant that Jordan's current stay-put placement should be terminated. Time is of the essence in arranging Jordan's placement for the 2003–04 school year. Plaintiff had four days of hearing in which to convince an administrative law judge that defendant's proposed placement for Jordan in Portage and at the Wisconsin School for the Deaf was inappropriate under the IDEA and failed to make the showing. In this court, she has failed to show that the administrative law judge's conclusion is flawed. Moreover, she has not articulated a viable alternative to defendant's proposed placement. An entire school year has come and gone since plaintiff made her request for a due process hearing. With only a few years of public education remaining, Jordan cannot afford to spend another year, or even another semester, in a stay-put placement that both parties agree is incapable of fulfilling the requirements of his individualized education plan. I recognize that at least one court has concluded that "[o]ne of the obvious purposes of the 'stay-put' provision is to reduce the chance of a child being bounced from one school to another, only to have the location changed again by an appellate court." *Flour Bluff Independent School District v. Katherine M.*, 91 F.3d 689, 695 (5th Cir.1996). However, I believe it is unlikely that Jordan will face such a fate, given defendant's carefully crafted plan for his education. Accordingly, I will grant defendant's request to terminate Jordan's current stay-put placement.

E. *Section 504 of the Rehabilitation Act*

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." Plaintiff maintains that the proposed commute to the Wisconsin School for the Deaf two days each week shortens Jordan's weekly academic program by approximately 5 hours solely on the basis of his disability. "[S]ection 504 is prohibitory, forbidding exclusions from federally-funded programs on the basis of handicap, rather than mandatory, creating affirmative obligations. The [IDEA], by contrast, because of its focus on appropriate education, imposes affirmative duties regarding the content of the programs that must be provided to the handicapped." *Timms*

*v. Metropolitan School District,* 722 F.2d 1310, 1317–18 (7th Cir.1983) (discussing the predecessor to the IDEA, the Education for All Handicapped Children Act). "Because section 504 forbids exclusion from programs rather than prescribing the programs' content it reaches grosser kinds of misconduct than the [IDEA]." *Id.; see also Monticello,* 102 F.3d at 902–03; *School District of Wisconsin Dells v. Z.S.,* 184 F.Supp.2d 860, 883–84 (W.D.Wis.2001); *Wenger v. Canastota Central School District,* 979 F.Supp. 147, 152 (N.D.N.Y.1997) ("[ S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."); *Brantley v. Independent School District,* 936 F.Supp. 649, 657 (D.Minn.1996) (" § 504 provide[s] relief from intentional discrimination whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination.").

I have concluded that defendant's placement offer for the 2002–03 school year provides Jordan with a free appropriate public education in the least restrictive environment and therefore does not violate the IDEA. The twice weekly commute to the Wisconsin School for the Deaf is an integral part of that placement. Because the placement is critical to Jordan's education, I cannot conclude that it is discriminatory or otherwise inappropriate. Accordingly, plaintiff's Rehabilitation Act claim cannot succeed and I will grant defendant summary judgment on this claim.

### ORDER

IT IS ORDERED that

1. Defendant Reedsburg School District's motion to strike the expert reports of Amy Otis–Wilborn and Laura Owens and Mary Ann Beckman is GRANTED;

defendant's motion to strike the expert reports of Antoinette Chambers and Bermans Iskandar is DENIED;

2. On the court's own motion, defendant is GRANTED summary judgment on all of plaintiff Tammy S.'s claims under the Individuals with Disabilities Education Act;

3. The parties' current stay-put agreement is terminated, effective the date of this order;

4. On the court's own motion, defendant is GRANTED summary judgment on plaintiff's claim under section 504 of the Rehabilitation Act; and

5. The clerk of court is directed to enter judgment for defendant and close this case.